TOWN OF HAMILTON & others *vs.* DEPARTMENT OF
PUBLIC UTILITIES & another
(and three companion cases).

Suffolk.    March 5, 1963. — May 17, 1963.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Public Utilities. Electricity.   State Administrative Procedure Act.   Quasi
  Judicial Tribunal.   Constitutional Law,* Federal agency, Supremacy
  clause.   *Equity Pleading and Practice,* Proceeding for review of decision of Department of Public Utilities.

Construction by an electric company of a transmission line to tie together
  two separated areas of its system each having different sources of power
  was not outside the scope of G. L. c. 164, § 72, even if the line would be
  only one "to shuttle power back and forth between areas" without a new
  source of electric power [136]; the record of a proceeding under c. 164,
  § 72, supported findings by the Department of Public Utilities that such
  construction was a reasonable step toward meeting existing and impending demands for current and to improve the company's system and would
  serve the public convenience and interest.   [136]
Upon appeals under G. L. c. 25, § 5, from approval on conditions by the
  Department of Public Utilities of construction of an overhead electric
  transmission line under c. 164, § 72, the decision of the department, while
  reflecting a consideration of the conflicting interests and contentions, did
  not comply in certain respects with the requirement of § 11 (8) of the
  State Administrative Procedure Act, c. 30A, that the department set
  forth its reasons and findings of fact sufficiently to guide this court on
  review under § 14 (8) of c. 30A of the department's specific determinations; portions of the decision must be set aside and the case remanded
  to the department for adequate subsidiary findings.   [137]
The right of the Department of Public Utilities under § 11 (5) of the

State Administrative Procedure Act, G. L. c. 30A, to utilize its "technical competence and specialized knowledge in the evaluation of the evidence" presented in a proceeding under c. 164, § 72, for its approval of construction of a transmission line by an electric company did not make unnecessary the specific findings by the department required by c. 30A, § 11 (8). [137]

Upon appeals under G. L. c. 25, § 5, from a decision of the Department of Public Utilities in a proceeding under c. 164, § 72, for its approval of construction of an overhead transmission line by an electric company, subsidiary findings by the department did not support a conclusion that "the public interest will best be served" by permitting construction of a portion of the line near a United States Air Force radio astronomy station, subject to power reserved to the department to order the company to replace that portion of the line after its installation "if the Department finds that the line causes interference with the operation of the . . . station of a sufficient magnitude, and that the public interest requires such replacement," where it appeared that any substantial interference with the station, even though brief, would be contrary to the public interest, that it was "impossible to determine beforehand" whether such interference would be caused and replacement of the portion of the line near the station soon after installation was a distinct possibility, and that several physically feasible alternatives were proposed [137–140]; the fact that there was some existing interference with the station would not justify imposition of additional interference which would make the station ineffective. [140–141]

Approval by the Department of Public Utilities under G. L. c. 164, § 72, of construction by an electric company of a transmission line a segment of which would pass within a short distance of, and might cause interference with, a United States Air Force radio astronomy station did not conflict with the supremacy clause of art. VI of the United States Constitution. [141]

A finding by the Department of Public Utilities under G. L. c. 164, § 72, that a route proposed by an electric company for construction of a transmission line was in the public interest was not precluded by failure of the company to make a careful study of an alternate route proposed by other parties and not proposed by the department for study. [142]

Findings by the Department of Public Utilities in a proceeding under G. L. c. 164, § 72, by an electric company for approval of construction of an overhead transmission line, merely that an alternative proposal by other parties that the line should be placed underground was supported only by "aesthetic considerations" involving "greatly increased costs" and that the adverse effect on property values of an overhead line was exaggerated, were inadequate to show that the department's decision to subordinate such general welfare factors was in the public interest. [143]

In a proceeding under G. L. c. 164, § 72, by an electric company for approval by the Department of Public Utilities of construction of an overhead transmission line, the department in determining the public interest and convenience must fairly weigh the adverse effect of an overhead line on general welfare factors, and because of such factors may require con-

struction of an underground line or an overhead line on an alternate route notwithstanding increased costs.   [144]

Enumeration of some of the matters on which the Department of Public Utilities should make specific findings in a proceeding under G. L. c. 164, § 72, by an electric company for approval of construction of an overhead transmission line within the boundaries of a railroad right of way already burdened with the railroad tracks and with poles and wires but going through the civic center of a town which, with other parties to the proceeding, proposed that the line should be placed underground. [144–145]

The cost to an electric company of constructing an underground transmission line in an area during a certain year would be admissible in the discretion of the Department of Public Utilities in a proceeding by the company to secure approval of construction of an overhead transmission line in the same general area some years later provided ascertainable changes in costs of labor and materials in the interval were taken into account.   [146]

FOUR PETITIONS filed in the Supreme Judicial Court for the county of Suffolk on June 29, 1961, July 14, 1961, July 18, 1961, and July 19, 1961, respectively.

The cases were reserved and reported by *Williams, J.,* without decision.

*Edward Morley* for the town of Hamilton & others.

*Richard M. Russell,* pro se, and for the estate of Henry R. Shepley.

*Robert H. Hopkins* (*Ansel B. Chaplin* with him) for the town of Ipswich.

*Alan S. Rosenthal,* Attorney, Department of Justice (*Daniel B. Bickford,* Assistant United States Attorney, with him), for the United States.

*Harold Putnam,* Assistant Attorney General, for the Department of Public Utilities.

*Charles C. Cabot* (*Philip H. R. Cahill* with him) for Massachusetts Electric Company, intervening respondent.

WHITTEMORE, J.   These four consolidated appeals under G. L. c. 25, § 5, reported by a single justice without decision upon the pleadings and the complete record, present issues of law in respect of a decision and underlying rulings of the Department of Public Utilities.   The decision, dated June 2, 1961, determined under G. L. c. 164, § 72, that the construction and use by Merrimack-Essex Electric Company (now, by merger, Massachusetts Electric Company, herein

called the company) of a line for the transmission of elec-
tricity between Newburyport and North Beverly and (by
connection at Ipswich) Gloucester, are (substantially in the
words of § 72) "necessary for the purposes alleged and will
serve the public convenience and are consistent with the
public interest." The decision reserved to the department
power to order replacement of a portion of the line close
to a United States Air Force radio astronomy station at
Sagamore Hill in Hamilton near the Essex boundary.

The appeals are by (1) the town of Hamilton, Francis R. Appleton, Jr., the estate of Fanny L. Appleton, and Henry R. Shepley;[1] (2) Henry H. Meyer, Richard M. Russell, Essex township preservation and improvement committee, and committee for underground power lines; (3) the town of Ipswich; and (4) the United States of America. There is no brief for three of the four parties in the second appeal, but Richard M. Russell for himself and the estate of Henry R. Shepley has joined in the brief of the parties in the first appeal (hereinafter the Hamilton parties). The company has intervened as a respondent in each appeal.

The approved new line, about thirty-two miles in total length, runs southerly from Newburyport 12.4 miles through Newbury, Rowley, and Ipswich to "Ipswich Junction." From the junction the southeasterly segment runs 13.7 miles through Ipswich, a corner of Hamilton, Essex, and Gloucester. This segment of the line will pass within a half mile of Sagamore Hill. The other segment runs 5.8 miles along the Boston and Maine Railroad right of way through Ipswich, Hamilton, Wenham, and Beverly, to the North Beverly substation.

The route which has been approved is substantially that originally proposed by the company. In the course of the hearing the department, pursuant to G. L. c. 164, § 72,[2] proposed consideration of an alternate route over the Ipswich and Essex marshes, taking off from the north-south line in Ipswich at a point above Ipswich Junction, that is, at Paradise Road, and rejoining the approved route near the Gloucester boundary. Additionally, parties other than the company suggested and presented evidence as to a shorter and partially underground course across the marshes and as to alternatives to the construction of a tie line.

The approved proposal is the erection, ultimately, of two

---

[1] Although the estate of Henry R. Shepley has joined in the Hamilton brief there is no formal suggestion of death and no amendment to substitute the personal representatives of the deceased. As there are other parties in the same interest we have considered the appeal as though these formalities had been met. If the personal representatives wish, they may be substituted as parties before the department.

[2] "The company may at any time before such hearing change or modify . . . the route of said line, either of its own motion or at the instance of the department or otherwise."

23,000 volt, 60-cycle, three-phase circuits, on parallel lines of wooden poles about thirty-five feet high with cross arms "normally" twenty-six feet above ground. Each circuit structure will "carry three conductors in a four foot triangular configuration." Only one circuit is to be constructed presently.

The purpose of the new line is to tie together separated segments of the eastern part of the company's system for distribution and sale of electricity, that is, Newburyport, Newbury, West Newbury, and Haverhill on the north (the Haverhill-Newburyport area), and Beverly, Wenham, Hamilton, Essex, Rockport, and Gloucester on the south (the Beverly-Gloucester area). Each area has different sources of power.

The Haverhill-Newburyport area is separated from the Beverly-Gloucester area by the towns of Rowley and Ipswich, which have municipal plants. None of the requirements of Ipswich is supplied by the company, and only a small part of the requirements of Rowley.

An important purpose of the new line when the petition was filed in 1958 was to provide the Haverhill-Newburyport area and, by the two segments below Ipswich Junction, the Beverly-Gloucester area with "firm capacity," that is, a capacity to serve the peak load in the area even though the largest generating unit or supply line is out of service. An additional purpose at all times has been to improve the company's capacity for growth in the hundred square mile district between Newburyport and Beverly.

The department found that each of the Haverhill-Newburyport and Beverly-Gloucester areas had adequate total capacity to meet its peak demands, but was deficient in firm capacity. It also found that, although in 1958 the new lines would have given each area firm capacity, the load growth had been such that in 1961 the "excess capacity has diminished, if not disappeared." It held, however, that this did not make the line unnecessary "for the purpose alleged."[3]

---

[3] "[P]lanning for the future must be done continuously and . . . it was never represented that this line would be able to firm these areas for more

Hamilton *v.* Department of Public Utilities.

1. No objection appears to have been made to the participation of any appellant and it is not contended that any of them is not an aggrieved party. *Wilmington* v. *Department of Pub. Util.* 340 Mass. 432, 438–439. *Sudbury* v. *Department of Pub. Util.* 343 Mass. 428, 433–434.

2. There is nothing in the contention of the Hamilton parties that the construction of a transmission line without an accompanying new source of electric power is outside the scope of G. L. c. 164, § 72. The statute provides, inter alia: "An electric company may petition the department for authority to construct and use . . . a line for the transmission of electricity for distribution in some definite area or for supplying electricity to itself or to another electric company or to a municipal lighting plant for distribution and sale, or to a railroad, street railway or electric railroad, for the purpose of operating it . . . ." This line, even if it is only a line "to shuttle power back and forth between areas" as the Hamilton parties describe it, is a line to supply electricity for distribution and to the company, and nothing turns on the circumstance that the electricity supplied and transmitted may not originate in a new generator.

3. The decision includes findings, in substance, that the construction of the proposed tie line is a reasonable step toward meeting existing and impending demands for current which cannot presently be met and to improve the system for the purpose it serves. These findings are amply supported in the record; these purposes are appropriate purposes for a new line. The decision shows that the line has immediate importance and long-range significance even though it will not give a fully sure and adequate reserve pending the addition of one or more new sources of power. From the standpoint of the company and its customers there can be no doubt that the order approving the new line meets the statutory criteria.

than four or five years. The principal advantage of a tie line is that it will always permit shuttling of power between these areas and [a result of the lines will be] that . . . to firm any or all of these areas it would be necessary to introduce additional capacity in only one area." "[A]n annual rate of load growth in the combined areas of approximately 7% per year . . . [shows] that additional capacity is needed in these areas if continuity of service is to be insured."

4. The remaining issues concern the location of the line and whether it should be, in part, underground. The appellants contend that the construction of the line in the approved locations will not serve large segments of the public convenience or be consistent with important public interests and that, there being reasonable alternatives, the line cannot be held "necessary for the purpose alleged."

The carefully prepared decision shows that the department has considered the conflicting interests and contentions; more than this, however, is now called for. The State Administrative Procedure Act, G. L. c. 30A, is applicable (*Newton* v. *Department of Pub. Util.* 339 Mass. 535, 542; *Fortier* v. *Department of Pub. Util.* 342 Mass. 728, 734) to require, by § 11 (8), that the decision "be accompanied by a statement of reasons . . . including determination of each issue of fact or law necessary to the decision . . .." A purpose is to require the agency to give a "guide to its reasons" so that this court may "exercise . . . [its] function of appellate review." There is thus a "duty to make adequate subsidiary findings." *Leen* v. *Assessors of Boston,* 345 Mass. 494, 502. *Bay State Harness Horse Racing & Breeding Assn. Inc.* v. *State Racing Comm.* 342 Mass. 694, 701. *Packard Mills, Inc.* v. *State Tax Comm.* 345 Mass. 718, 723, 725–726. The findings do not enable us to ascertain whether, in aspects discussed below, the department's specific determinations were "based upon an error of law," or "unsupported by substantial evidence" or in some respect "not in accordance with law." G. L. c. 30A, § 14 (8). It is, therefore, necessary to set aside certain portions of the decision so that such findings may be made as will enable us to fulfill our function of reviewing these determinations.

The department's right to utilize its "technical competence and specialized knowledge in the evaluation of the evidence" (G. L. c. 30A, § 11 [5]) may be reflected in the specific findings; it does not make specific findings unnecessary.

5. Turning first to the appeal of the United States, we hold that the subsidiary findings are insufficient to show

Hamilton *v.* Department of Public Utilities.

that the public interest and convenience are met by the order for construction of an overhead line close to Sagamore Hill, subject to removal and relocation. The available alternatives are either to place the line, near the facility, underground or to place it on a more distant route.

The department has in substance found that the new line may cause such interference with the Sagamore Hill facility that it will not be in the public interest. It has expressly found that "it is impossible to determine beforehand whether the . . . line will . . . cause interference . . . [and that there] is only one positive method of determining whether the proposed line will cause objectionable interference . . . and that is by actual field tests . . . after the line has become operational." Hence, the department concluded that "the public interest will best be served" by permitting the line to be constructed as proposed, subject to the reserved power to order the company "to replace that portion of the line within a reasonable distance of the radio astronomy station, but in no event to exceed three miles, with a different type of construction if the Department finds that the line causes interference with the operation of the . . . station of a sufficient magnitude, and that the public interest requires such replacement."

Notwithstanding the qualification stated in the last clause of the foregoing quotation, we discern in the express findings, and in the reservation of power to require change, the implicit finding that interference with the facility which has a substantial effect on the work being done there will be contrary to the public interest at least if that work continues to be of its present high order of importance.[4] It

[4] The findings state: "There is no disagreement between the Air Force . . . [the company] and this Department as to the importance of its research program currently in effect. This program embarks on an entirely new field of endeavor. It is so technical and highly theoretical that little is known of the ultimate outcome. Included in the study are experiments in space communication whereby messages are transmitted by way of a planet from one point to some other distant point on the earth almost instantaneously. Programs are continually under way often on a twenty-four hour basis involving tracking across the sky of solar bodies, satellites, missiles, and identifying noise sources from heavenly bodies. It is the contention of the Air Force that the sensitivity of the equipment far exceeds anything heretofore designed or constructed."

would be difficult, if not impossible, on this record to affirm a contrary finding.

The decision that it is in the public interest to risk the cost of replacement of the line might find support in a finding, if it could be made, that the likelihood of the development of interference requiring change is slight, or in a finding, if sustainable, that the cost of change would be relatively little. There are no such express findings, and on the record we are unable to rule that they are to be taken as implied.

The only testimony which suggests that interference might not result was that of the company's expert, Stuart L. Bailey, a consulting engineer. His conclusion was that the specifications for the line were such that if it were tightly installed and specially maintained so as to be a "clean" line there was a "very good possibility," "a distinct possibility," that the line would not be a source of interference, barring accident or natural catastrophe. He recognized, however, that the line would be something of an experiment, and he testified that he knew of no line which in operation had been tight and clean. Even if the department entirely disregarded the testimony of contrary import given by the witnesses for the United States, Bailey's testimony points to a finding that the replacement of a substantial segment of the line is a distinct possibility. Such a finding is implicit in the department's conclusion that "it is impossible to determine beforehand" what interference the line will cause.

That there is this distinct possibility of replacement calls for a determination by the department as to the costs and feasibility of alternative underground or overhead routes, at least as to the line within two or three[5] miles of the Saga-more Hill facility, the irrecoverable loss if the line first

---

[5] Part of the segment from Ipswich Junction to North Beverly and the junction point itself are shown on maps as within three miles of Sagamore Hill. The brief of the United States appears to accept two miles as a satisfactory distance. If all of the line within three miles is to be at risk of replacement in the department's view, findings and reconsideration may be required as to both segments.

installed is abandoned, and a weighing and balancing of the specifically found opposing factors.

The subsidiary findings for such a determination do not appear. There is no finding as to the increased cost of placing the lines underground although, manifestly, as all submitted figures show, it would be substantial.[6]  There is no finding that for that part of the line on the approved route which would require replacement there is a feasible overhead route which could be acquired at reasonable cost and which would not be open to serious local objections. There are no findings as to how much of the initial cost of the replaced line would be nonsalvageable.

6. The United States contends that the conditional order is necessarily against the public interest because the construction of the line, as an experiment, puts the work at the facility at the hazard of such interference as does develop before the interference is located and stopped or the use of the line ended. There is force in this objection unless provision is made for promptly putting the line out of use. The company, having made the investment, would, understandably under the present order, seek time within which to overcome interference in the standing line if it develops.

The department, we conclude, has accepted the uncontroverted testimony that interference at any particular time, even though brief, could have the effect of lessening the value of accumulating comparative data, or of destroying an experiment then in progress involving another station, or of preventing the tracking by the Sagamore Hill station of a missile then in flight. No justification appears for subjecting the station to such hazards for more than a brief period. True, as the department has found, the facility was, on a balance of factors, consciously located in an area where it is subjected to some interference, but it appears to be undisputed that that interference does not make the station ineffective. It follows that existing interfer-

---

[6] An inadequate suggestion lies in the statement that the asserted average cost of $13.40 a foot across the marshes as compared to the company's figure of approximately $25.40 a foot for "normal underground construction" was "totally unrealistic."

ence does not justify adding interference which would do so.

The department, if it redetermines that a conditional order is in the public interest, must make more precise findings as to the criteria in respect of frequency, duration and extent of interference which will determine that the line will go out of use. The possible necessity for putting the new line at the risk of cessation of use soon after installation must be weighed with the other relevant factors, some of which are specified in point 5, *supra*.

The United States reinforces its argument by reference to the "economically feasible" overland marsh route. That route, however, met much local opposition[7] and would be subject to the public interest principles discussed in points 8 and 9 below. We may not weigh the conflicting aspects of the public interests involved. It is enough that there are several physically feasible alternatives to exposing the Sagamore Hill facility to indefinite serious interference.

7. We see nothing in the contention of the United States that the department's decision conflicts with the supremacy clause of the United States Constitution (art. VI). See *Penn Dairies, Inc.* v. *Milk Control Commn. of Pa.* 318 U. S. 261, 270–271. Compare *Ohio* v. *Thomas,* 173 U. S. 276; *Paul, Director of Agriculture of Cal.* v. *United States,* 371 U. S. 245; *United States* v. *Georgia Pub. Serv. Commn.* 371 U. S. 285. There appears to be nothing to prevent the air force from acquiring by eminent domain (or, before the company acquires its right of way, by purchase or gift) such easements, or other rights, as it may require for the protection of the Sagamore Hill installation. See 10 U. S. C. § 9773 (1958).

---

[7] "The extent of . . . [the] opposition has convinced us that this route is hardly less objectionable than the original petitioned route from the point of view of the local authorities and residents. Although there are certain advantages to this route, in particular, because it is a shorter route than the original route, they are outweighed by the considerations stemming from the proximity of this route to the sea. We find that while such a route is economically feasible, the maintenance problems created by the salt spray and tidal conditions, especially the occurrence in the winter of substantial mobile ice packs, makes this route a less reasonable alternative than the original route." Notwithstanding these difficulties the company's vice-president testified in substance that the route was an adequate alternative and that the line could be properly built and satisfactorily operated and maintained.

8.   The Hamilton parties contend that to avoid risk from placing high-power lines near where people congregate, and to avoid destruction of property values and of natural, as well as man-created, beauties and interference with the appropriate use of open spaces (all such considerations being sometimes hereinafter called "general welfare factors"), parts of the line should be placed underground.   These parties specify a dual proposal, dealt with in the record, as a reasonable alternative: (1) placing underground 5.1 miles of the alternative marsh route from Paradise Road to Gloucester; (2) abandoning the tie from Ipswich to North Beverly and in lieu thereof duplicating the present underground circuit from Beverly substation to North Beverly.

The department concluded that the proposal to bury cable across the marshes was "considerably more costly than the . . . [company's] proposal," and that "[w]hen one considers the construction problems involved, it . . . is not practicable or economically feasible to attempt to place a cable across tidewater marshes of this type."   The Hamilton parties object that these conclusions ignore the testimony of their qualified expert, and that the company made no study of the proposal, having taken the stand that it was not feasible, because of maintenance and other difficulties. This objection loses much of its force in the circumstance that the partly underground marsh route was neither a route sought by the company nor a route proposed by the department for study.   This possible alternate route did not and does not bar a finding, even though no careful study of this alternative has been made, that a route proposed under the statute is in the public interest.   If, on redetermination of the public interest issues dealt with in this opinion, the department should determine that no entirely aboveground route through Ipswich and Essex is in the public interest, a suitable course will be to direct the company to present a proposal for putting part, or all, of the branch to Gloucester underground.   Conceivably, the underground marsh route would then be relevant, either as a route proposed by the company or as an alternative thereto.

The rejection of the proposal of the Hamilton parties to add a second circuit from North Beverly to Beverly, rather than to extend the tie line from Ipswich Junction to North Beverly, was, of course, within the particular competence and a proper function of the department. It was adequately supported by evidence. If, however, the department should determine that overhead construction is not in the public interest, it will not be barred from reconsideration of this alternative.

9. The decision summarily rejects the proposals of the Hamilton parties to place parts of the line underground as supported only by "aesthetic considerations" involving "greatly increased costs"[8] and because the claimed adverse effect on property values was exaggerated. These summary findings are inadequate to enable us to determine whether the decision to subordinate these general welfare factors is in the public interest. Indeed, the findings suggest that the department, wrongly, may have failed to give these factors any appreciable weight.

The company and the department contend that the denial of the Hamilton parties' request to rule that the segment of the line through Hamilton would not be in the public interest is adequately supported, notably by the evidence that the line is to be installed entirely within the bounds of the railroad right of way which is already burdened by tracks and an operating railroad and also by an overhead telegraph or signal system of poles, cross arms, and from eighteen to twenty-four wires. They refer also to the testimony which supports the conclusion that the safety of the line would be within reasonable limits.

The evidence discloses, however, that the railroad line goes through the center of the town of Hamilton, and passes a playground that lies between the track and an elementary school, and passes within ten feet of a new youth

---

[8] "While we sympathize with the desires of the citizens of this area to preserve the scenic beauty . . . aesthetic considerations are not paramount and . . . could not justify installations of underground lines at greatly increased costs for the benefit of one particular area. To do so would place an undue burden upon all the rate payers for the benefit of a few."

center (an addition to the community house), and within thirty feet of the tennis courts and little-league ball field and also near a shopping center. It appears further that the town has acquired the former railroad station property, "the center of the . . . business district," and is considering plans to remove the building and beautify the area.

We hold, in accordance with our assumption in *Sudbury v. Department of Pub. Util.* 343 Mass. 428, 430, that in determining the public interest and convenience the adverse effect of overhead lines on general welfare factors must be fairly weighed. That decision forecast the holding, which we now make, that increased costs because of underground construction or alternate overland routes may be required in some cases because of such factors. It is appropriate for municipalities, even in the absence of guiding or controlling legislation, to plan to improve and beautify their central areas and public ways and to maintain the natural beauties of villages and rural areas. That overhead wires have been tolerated in many of the towns, cities, and countrysides of the United States (as they are not in all parts of the world) does not mean that the increased costs of accommodating a line to such planning may not be justified. See *State, ex rel. Cleveland Elec. Illuminating Co.* v. *Euclid,* 169 Ohio St. 476, *S. C.* 170 Ohio St. 45, appeal dismissed sub nom. *Cleveland Elec. Illuminating Co.* v. *Euclid,* 362 U. S. 457. True, Hamilton has formally declared no policy for its central areas. But it may be sound municipal planning to exclude a permanent high tension line through the center of the town. The future of the railroad is uncertain. The possibility of improving the area in appearance and for its highest and best civic uses may be appreciably greater if the new, aboveground power line is excluded.

The record, as we have noted, contains evidence of higher costs of underground construction. It is not our function, however, to determine what these costs might be or what the department means by "greatly increased costs" or to speculate what the department would find them to be, or their effect on consumer rates, or what in its view is the

adverse effect on property values which the decision appears to recognize. A high cost of placing the entire segment underground would not dispose of the contention as to the center of the town. Findings are required in respect of such matters.

The findings should be specific as to the cost of underground installation through the civic center of Hamilton, the effect of overhead wires on that part of the town for its present and its planned uses, the safety of overhead wires in congested areas, and the probable effect of overhead construction on property values, and also on general welfare factors, having in mind that such considerations may be of high importance in long range planning and that an adverse effect thereon may not be reflected immediately in lower property valuations. We recognize that the weight of relevant factors is different when determining the effect of the line in open areas. The department should, nevertheless, also make specific findings as to the cost of underground construction in the more rural areas through which the two segments of the line below Ipswich Junction will pass, and the effect in such areas of overhead wires. The determination of the balance of public interest and convenience may properly be made only after the opposing factors have thus been expressly found.

10. The town of Ipswich contends that the order is arbitrary pending the department's determination of the feasibility and reasonableness of a third alternative route for the segment from Ipswich Junction to Gloucester, about which no evidence has been received, but in which the department has indicated interest.[9] Since further proceed-

9 "[A] third alternative has been considered by some of the parties. . . . [I]t . . . appear[s] on Exhibit 31 as a so-called 'Modified Route.' In general, it lies southerly of the portion of the original route between Ipswich Junction and West Gloucester. . . . [A]t one time the Air Force indicated to the Department that it would not object if the line were relocated along this route. Although the record does not so indicate, it is possible that this route might prove to be more acceptable to the local authorities than the route which we approve here. Notwithstanding this order, we would attach considerable importance in a subsequent proceeding to the amount of support which might be given the 'Modified Route' by the local authorities involved." The "Modified Route" shown on exhibit 31 appears to pass for a considerable distance within less than a mile of Sagamore Hill, and it may be that this route aboveground may not meet the objections of the United States.

ings are required we agree that they should include hearings in respect of this route and that consideration of it should not depend upon whether subsequent hearings become necessary in respect of acquiring rights of way. See *Sudbury* v. *Department of Pub. Util.* 343 Mass. 428, 433.

11. The Hamilton parties contend that it was error to exclude evidence of the company's cost of constructing an underground circuit from Beverly to North Beverly in 1954. The department has wide discretion in such matters. See *Leen* v. *Assessors of Boston,* 345 Mass. 494, 505–507. However, this applicant's experience in underground construction in this general area (with ascertainable changes in costs of labor and materials since 1954) may be a significant indication of probable costs in 1963. Hence there may be adequate reasons for making these costs available to all parties at another hearing. Indeed, if it appears that these costs underlie the company's estimates of current underground costs, and those estimates are contested, the adverse parties will be entitled to see the figures and to cross-examine in respect thereof.

12. The rescript is to provide: (1) The decision of the department as to the necessity of, and the public convenience and interest in respect of, the tie line from Newburyport to North Beverly and to Gloucester is affirmed, subject to further proceedings before the department, consistent with this opinion, as provided below.

(2) The department shall redetermine whether and to what extent general welfare factors require that part or parts or all of the line from Ipswich Junction (or Paradise Road) to North Beverly (a) be placed underground, or (b) be relocated at a greater distance from Sagamore Hill.

(3) In respect of the connecting line to Gloucester: (a) As to so much thereof as lies within three miles of the Sagamore Hill facility, the department shall make a redetermination as to the public interest and convenience in ordering aboveground construction on the condition that part of it may be ordered replaced. The department shall in this connection consider whether an initial installation at greater cost, in part underground or in another location

or both, would serve the public interest and convenience. (b) The department shall investigate further the possibilities of the so called third alternative route. (c) The department shall redetermine whether general welfare factors require that any part or all of the connecting line to Gloucester be placed underground.

(4) This order is without prejudice to the right and power of the department on its own initiative to make a redetermination in respect of the necessity of any segment of the tie line, or to make such other redetermination as to any relevant matter as it shall deem to serve the public convenience and be consistent with the public interest.

(5) The department shall hold such further hearings as the law requires and may order such additional hearings as it deems advisable. It shall in all instances make the necessary subsidiary findings.

*So ordered.*