NEW ENGLAND POWER COMPANY *vs.* BOARD OF SELECTMEN
OF AMESBURY & others.[1]

Suffolk. January 3, 1983. — May 3, 1983.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Public Utilities. Electricity. Statute,* Construction. *Municipal Corporations,* Electric lines. *Way,* Public: electric lines.

A town's board of selectmen had neither authority pursuant to G. L. c. 166, §§ 22 and 22B, nor inherent authority, to rescind the approval it had previously granted for street crossing locations for an electric power company's proposed overhead transmission line. [73-78]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on March 2, 1982.

The case was reported by *Abrams, J.*

*John F. Sherman, III (Peter G. Flynn* with him) for the plaintiff.

*Joseph E. Faro (Nancy Von Kittlitz* with him) for the defendants.

*James R. McIntosh & Linda M. Wilder-Curtis,* for New England Power Pool Executive Committee, amicus curiae, submitted a brief.

*Maurice J. Ferriter, Mitchell J. Sikora, Jr., & Kenneth M. Barna,* for. Massachusetts Municipal Wholesale Electric Company, amicus curiae, submitted a brief.

*John J. Desmond, III, & John F. Smitka, Jr.,* for Boston Edison Company, amicus curiae, submitted a brief.

ABRAMS, J.  The plaintiff, New England Power Company (company), brought this action for declaratory relief pursuant to G. L. c. 231A, seeking to have a single justice of this court declare that the Amesbury board of selectmen (board)

---

[1] Christopher Cashman, Rosemary Cashman, Kenneth G. Terry, Sr., and Robert Gaudet, individually, and as selectmen of the town.

is without authority to rescind previously granted "street crossing locations" for an overhead transmission line. G. L. c. 166, § 22.[2] The single justice reserved decision and reported this case to the full court on a statement of agreed facts.[3] We conclude that a declaration should be entered that the board is without authority to rescind its grant of street crossing locations for the plaintiff's proposed transmission line.[4]

We summarize the facts. The defendants voted to rescind their prior grant to the company of public way crossing locations for the transmission line. The plaintiff is a Massachusetts public utility, which is a subsidiary of the New England Electric System, a public utility holding company. The company generates and sells electricity at wholesale rates to its retail affiliates, who in turn sell electricity at retail rates to customers in Massachusetts, Rhode Island, and New Hampshire. The company makes about 72% of its sales to its Massachusetts affiliates, who sell electricity to approximately 772,000 Massachusetts retail customers.

---

[2] The company further sought an allowance of its motion for a speedy trial, see G. L. c. 231, § 59A; Mass. R. Civ. P. 57, 365 Mass. 826 (1974), and entry of summary judgment in its favor, Mass. R. Civ. P. 56, 365 Mass. 824 (1974).

[3] Amicus curiae briefs also were submitted by the Boston Edison Company, the Massachusetts Municipal Wholesale Electric Company, and the New England Power Pool Executive Committee.

[4] The board claims that the company should be required to exhaust its administrative remedies before the department under G. L. c. 166, § 28, prior to seeking a declaration of rights from this court. We do not agree. The issue of the board's authority under G. L. c. 166, § 22, to revoke previously granted public way crossing locations for transmission lines "is a pure question of law the resolution of which is not uniquely committed to resolution through administrative fact-finding." *Gallagher* v. *Metropolitan Dist. Comm'n*, 371 Mass. 691, 699 (1977). See *Andover Sav. Bank* v. *Commissioner of Revenue*, 387 Mass. 229, 232-233 (1982). See, e.g., *School Comm. of Greenfield* v. *Greenfield Educ. Ass'n*, 385 Mass. 70, 76 (1982). Thus, declaratory relief is appropriate. *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 845 (1977). See *Murphy* v. *Administrator of the Div. of Personnel Admin.*, 377 Mass. 217, 221-222 (1979).

The company and other affiliates of New England Electric System are members of the New England Power Pool, which consists of sixty electric companies in New England who have agreed to combine their electric generation and transmission facilities. The New England Power Pool comprises over 98% of the generating capacity and virtually all of the transmission network supplying New England customers, and assists its participants in planning, constructing, and operating this interconnected New England bulk power supply system.

Certain participants in the New England Power Pool, including the company, joined together to build a 2-unit, 2,300 megawatt nuclear electric generating facility in Seabrook, New Hampshire, which is currently under construction. The company will be entitled to approximately 10% of the output of each unit, and other Massachusetts utilities will be entitled to another 19% of the output of each unit.

As its part in the Seabrook project, the company must construct the Massachusetts portion of one of three 345 kilovolt transmission lines that will connect the plant with the rest of the New England bulk power supply system. This segment, referred to as the Tewksbury-Amesbury line, will be a 32.03 mile overhead transmission line that will run from the company's Tewksbury substation through Amesbury and other municipalities[5] to the New Hampshire border, where it will connect with another 345 kilovolt line running to the plant itself. The Tewksbury-Amesbury line will be used solely for transmitting energy in bulk and will not be used for local distribution.

In order to build this transmission line, the company secured several governmental authorizations. In 1977, after public hearings, it secured approval by the Massachusetts Energy Facilities Siting Council of its long range plans to construct bulk power facilities including the Tewksbury-Amesbury transmission line. See G. L. c. 164, § 69J.

---

[5] The line will pass through Andover, Dracut, Methuen, Boxford, Groveland, Georgetown, West Newbury, Merrimac, Amesbury, and the city of Haverhill.

After obtaining this authorization, the company sought and, in January, 1978, received grants of the right to have the transmission line cross public ways, pursuant to G. L. c. 166, § 22, from eleven communities on the line's route, including Amesbury. In June, 1978, the company commenced proceedings before the Department of Public Utilities (department). It petitioned for a determination that the proposed line was necessary, would serve the public convenience, and was in the public interest, and for permission to build the line. See G. L. c. 164, § 72. Also, it separately sought authority to take certain land by eminent domain and sought exemption of the transmission line from the affected municipalities' zoning by-laws or ordinances. See G. L. c. 40A, § 3.

The department held fifteen days of public hearings with testimony from expert witnesses, as well as unsworn statements from local residents, including approximately sixteen Amesbury residents. Virtually all of the participants at the hearing focused on the proposed line's safety, and whether it should be placed underground. On January 6, 1983, the department granted all three of the company's petitions, thereby authorizing construction of the line, and denying the principal intervener's March, 1982, motion to reopen the record to admit further evidence on the feasibility of an alternative route for the line.

After receiving the municipalities' grants of street crossing locations, and during the department's proceedings, the company engaged in several activities designed to prepare the line for construction. These activities included performing the engineering work for the line and acquiring rights of way. From January 1, 1978, to March 1, 1982, the company spent, or became committed to spend, approximately $2,657,000 for these activities and for its proceedings before the department. It also spent, or became committed to spend, $168,500,000 for construction of the Seabrook nuclear power plant.

In May, 1979, the Amesbury town meeting adopted an ordinance directed specifically at the proposed Tewksbury-

Amesbury transmission line, which required all lines for the transmission of more than 69 kilovolts to be placed underground. This ordinance was relabeled a by-law at a special Amesbury town meeting in 1980. The Attorney General subsequently disapproved this by-law on the ground that "the regulation of such transmission lines is committed to state agencies, rather than municipalities."

In the fall of 1981, the board, acting on safety concerns of one of the selectmen, decided to hold a public hearing on whether to rescind its January 3, 1978, vote granting the company street crossing locations. On March 30, 1982, after receiving a petition from a group of Amesbury physicians, and letters from the company claiming that the board was without authority to rescind its earlier grant, and after hearing unsworn statements from approximately seventeen persons in favor of rescission, four of the five selectmen voted to rescind the previous grant of street crossing locations for the proposed transmission line.[6]

The company contends that G. L. c. 166, § 22, does not give the board authority to rescind previously granted transmission line street crossing locations. Further, the company argues that the board neither had authority pursuant to G. L. c. 166, § 22B, nor inherent authority to rescind. We agree.

Public utilities providing electricity are regulated by the State. See G. L. c. 164, and G. L. c. 166; *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79, 82 (1968). By virtue of G. L. c. 166, § 21, as amended through St. 1951, c. 476, § 1, the company has the authority to construct electric transmission lines "upon, along, under and across the public ways." General Laws c. 166, § 22, gives authority to boards of selectmen (boards) to grant street crossing locations for transmission lines.

---

[6] A vote to rescind was taken at a February 22, 1982, selectmen's meeting. This meeting was conducted without prior notice to the company, which filed this law suit on March 2, 1982. The board then retracted their rescission and scheduled the March 30, 1982, meeting, after giving the company prior notice of the meeting.

Section 22 also details a board's authority to regulate the street crossing locations by empowering a board to allow alterations or changes in the location of poles and height of cables or wires, increases in the number of wires or cables, and joint locations for different utility companies. Although § 22 delineates a board's power over several aspects of transmission line street crossing locations, it does not contain any language giving a board authority to rescind the locations once granted.

The statute specifically includes the power to grant or refuse to grant street crossing locations, and it implicitly excludes the power to revoke. This statutory language "is not conclusive of legislative intent, but is to be considered with regard to the object sought to be obtained by the entire legislation of which the subject matter to which it relates is but a part." *Simmons* v. *County of Suffolk*, 230 Mass. 236, 237 (1918). See *Creed* v. *Apog*, 377 Mass. 522, 524 (1979); *Iannelle* v. *Fire Comm'r of Boston*, 331 Mass. 250, 252-253 (1954); *General Elec. Co.* v. *Commonwealth*, 329 Mass. 661, 664 (1953). Further, in G. L. c. 166, the Legislature explicitly granted boards specific power to revoke certain actions. General Laws c. 166, § 22, gives a board the power to revoke the street crossing locations of street railway and electric railroad companies in accordance with the procedures established by G. L. c. 161, §§ 77 & 82. Section 24 of G. L. c. 166 gives a board authority to revoke previously granted permission to construct power lines for private use on public ways. However, there is no provision in § 22 granting a board the power to revoke transmission line street crossing locations once granted. "This is of some significance in view of the large number of instances to be found in our statute where the power to revoke is conferred in express terms." *General Baking Co.* v. *Street Comm'rs of Boston*, 242 Mass. 194, 196 (1922). Further, the comprehensiveness of § 22 compels a conclusion that the Legislature, by excluding a power to revoke such locations in § 22, intended to preempt a municipality from rescinding its granted street crossing locations. We do not imply lan-

guage in a statute if the Legislature has not provided it. *Beeler* v. *Downey*, 387 Mass. 609, 616 (1982). *Commonwealth* v. *Vickey*, 381 Mass. 762, 767 (1980).

Even if the board had authority to revoke, the company argues, pursuant to *Selectmen of Topsfield* v. *Department of Pub. Utils.*, 267 Mass. 343 (1929), that attempts to revoke are ineffective where the utility has accepted the street crossing locations and has acted in reliance on the municipal grant in making its expenditures.[7] We agree. We conclude that the company's reliance on the street crossing locations granted by the various municipalities was reasonable, and thus, even if there were authority to revoke, there would be no authority to do so in this case. *Selectmen of Topsfield* v. *Department of Pub. Utils.*, *supra*.[8]

The board further claims that G. L. c. 166, § 22B, gives it the statutory authority to revoke its grant of street crossing locations for the company's proposed transmission line. General Laws c. 166, § 22B, included within §§ 22A-22N,[9] confers upon municipalities the authority to order that certain power lines be placed underground. Section 22A contains the definitions of the words used in §§ 22B-22N. Sec-

---

[7] The statement of agreed facts indicates that the company spent about $2,657,000 in reliance on the grant of street crossing locations.

[8] The board contends that we should not adhere to our reasoning in *Topsfield* because in *Topsfield*, unlike this case, the electric company had received the department's permission to construct the line before the board revoked the street crossing locations. Therefore, the board argues, the company's actions and expenditures in reliance on the board's grant of locations were not reasonable since the department's permission to construct the line may not have been forthcoming.

However, there is no particular order in which the various permissions necessary to construct a transmission line must be obtained. *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79, 82 (1968). "Obviously, all acts which must be performed before a transmission line can be constructed cannot be performed simultaneously." *Sudbury* v. *Department of Pub. Utils.*, 351 Mass. 214, 224 (1966). See also *Framingham* v. *Department of Pub. Utils.*, 355 Mass. 138, 143 (1969). Consequently, we believe the company's reliance on the board's grant of street crossing locations was reasonable.

[9] General Laws c. 166, §§ 22A-22N, is entitled "An Act relative to poles and overhead wires and associated overhead structures." St. 1969, c. 884.

tion 22A (*e*) expressly states that all poles, towers, overhead wires and associated structures "used exclusively in the transmission but not the distribution of electricity" are excluded from the operation of §§ 22B-22N. Section 22A (*h*) defines transmission as the carrying of "electric power in excess of twenty thousand volts." Consequently, the company's proposed 345 kilovolt Tewksbury-Amesbury transmission line; at issue in this case, is not affected by G. L. c. 166, §§ 22B-22N, which gives municipalities the power to order underground placement of local distribution lines carrying 20 kilovolts or less.[10]  See *Boston Edison Co.* v. *Sudbury*, 356 Mass. 406, 418 n.10 (1969).

Finally, the board argues that, even absent statutory authority, it has inherent authority to revoke permission for street crossing locations in order to protect the health and safety of Amesbury citizens. Implying a power to rescind, absent statutory authority, could hinder the legislative scheme which gives over-all final authority for the regulation of electric transmission lines to State agencies, and which provides Amesbury and other municipalities with a competent forum in which to raise their safety concerns.

The Legislature has delegated to the department the primary responsibility for the regulation of the construction of transmission lines.[11]  "In various respects . . . the general

---

[10] The company also argues that, even if §§ 22B-22N applied, these sections only would give an Amesbury town meeting, on its selectmen's recommendation, the power to enact a by-law ordering the underground burial of distribution lines. Since we conclude that §§ 22B-22N do not apply to the transmission line at issue in this case, we do not reach the issue of the scope and operation of these sections.

[11] The Energy Facilities Siting Council (siting council) also has responsibility for transmission lines. Companies must submit a long-range forecast and a yearly supplement of electric power needs to the siting council, describing plans to build any transmission lines longer than one mile and carrying more than 69 kilovolts. G. L. c. 164, §§ 69G, 69H, 69I. The forecast must include an analysis of any alternatives to the line and an analysis of the line's environmental impact. Adjudicatory public hearings must be held on the forecasts and supplements. See G. L. c. 164, § 69J. Subsequent approval of the forecast means that only the transmission line approved in the forecast can be constructed, and that no other State agency can issue a construction permit for a transmission line that has not been approved by the siting council. G. L. c. 164, § 69I.

regulation of transmission lines, on a reasonably comprehensive basis, has been placed in the D.P.U." *Boston Edison Co.* v. *Sudbury,* 356 Mass. 406, 419 (1969).[12] The Legislature, in vesting over-all responsibility for the regulation of transmission lines in State agencies and particularly in the department, has recognized "the absolute interdependence of all parts of the Commonwealth and of all of its inhabitants in the matter of availability of public utility services, and [has given] to the Department the power to take action necessary to insure that all may obtain a reasonable measure of such vital services." *Pereira* v. *New England LNG Co.,* 364 Mass. 109, 121 (1973).

By centralizing authority for construction and regulation of transmission lines in the department, the "Legislature intended a broad and balanced consideration of all aspects of the general public interest and welfare and not merely examination of the local and individual interests which might be affected." *New York Cent. R.R.* v. *Department of Pub. Utils.,* 347 Mass. 586, 592 (1964). The department, in the course of determining whether the transmission line will serve the public interest, must investigate need, safety, feasibility, aesthetic considerations, and increased costs. See *Hamilton* v. *Department of Pub. Utils.,* 346 Mass. 130, 142-145 (1963).

Clearly, the Legislature has delegated to the department, not to local municipalities, the authority to make basic determinations on the safety of transmission lines. "It is plainly desirable that there be some uniformity in the safety standards applicable to such lines which pass through more than one town or city and are of general regional or State-wide interest." *Boston Edison Co.* v. *Sudbury, supra* at 420. The board has had a full opportunity to raise questions concerning the line's safety before the department. The department fully considered health and safety factors, see Petition of New England Power Co., D.P.U. #19559,

---

[12] See, e.g., G. L. c. 164, §§ 71, 72, and 76; G. L. c. 40A, § 3; G. L. c. 30, § 61 et seq.

19630, and 19631,[13] at 11-14, 17-18 (January 6, 1983), and concluded that "a health hazard from a facility of the type proposed herein has not been established. . . . [We] conclude that an adverse health impact is at the most only conjecture at this time. To deny the Petitioner's proposal on such speculation at this time is not an alternative which the record would justify." *Id.* at 18.[14]

By giving the department extensive authority and power to regulate the construction and use of transmission lines, and to investigate fully the safety of proposed lines, the Legislature impliedly has denied municipalities the authority to revoke or rescind previously granted street crossing locations. "To hold otherwise would impute to the Legislature an intent to Balkanize the Commonwealth and to permit any single municipality to deny access to such vital services to any and all other municipalities. We do not impute such an intent." *Pereira* v. *New England LNG Co.*, 364 Mass. 109, 121 (1973).

We conclude that the board was without authority to rescind its grant of street crossing locations for the company's proposed Tewksbury-Amesbury transmission line. We remand this case to the single justice for entry of a judgment declaring that the board did not have authority to revoke its previously granted approval of street crossing locations.

*So ordered.*

---

[13] Department of Public Utilities #19559 sought a determination from the department that the proposed transmission line would serve the public convenience and was consistent with the public interest, and sought permission to construct the line. Department of Public Utilities #19630 sought an exemption from the operation of the affected municipalities' zoning by-laws. Department of Public Utilities #19631 sought authorization to take by eminent domain certain lands necessary for the construction or use of the proposed transmission line.

[14] If the board challenges the adequacy of the department's decision, it can appeal that determination. See *Hamilton* v. *Department of Pub. Utils.*, 346 Mass. 130, 143-145 (1963).