PUBLIC SERVICE COMPANY OF
NEW HAMPSHIRE, Plaintiff,
Appellant,

v.

TOWN OF WEST NEWBURY, Thomas
E. Pulkkinen, and Patricia Wells
Knowles, Defendants, Appellees.

No. 87–1395.

United States Court of Appeals,
First Circuit.

Heard Sept. 14, 1987.
Decided Dec. 16, 1987.

Robert J. Stillman with whom Thomas G. Dignan, Jr., Paul J. O'Donnell and Ropes & Gray, Boston, Mass., were on brief for plaintiff, appellant.

Judith H. Mizner with whom Silverglate, Gertner, Fine, Good & Mizner, Boston, Mass., R. Scott Hill–Whilton, Lagoulis, Clark, Hill–Whilton & McGuire, Newburyport, Mass., were on brief for defendants, appellees.

Before COFFIN, ALDRICH and TORRUELLA, Circuit Judges.

COFFIN, Circuit Judge.

This is an appeal from the denial of a preliminary injunction sought by Public Service Company of New Hampshire (the Company), owner of the nuclear power plant in Seabrook, New Hampshire, to prevent the Town of West Newbury, Massachusetts (the Town), from removing five utility poles bearing emergency warning sirens. Such sirens are part of the Company's emergency preparedness plan in connection with its efforts to obtain an operating license for the power plant.

### I.

In 1984 the Company applied for and received permits from the Town's Board of Selectmen to install the poles. Over a year later, in late 1985 and early 1986, the Company installed the poles, which stand 60 to 65 feet high. In March, 1987, the Board determined that it had proceeded without statutory authority, and ordered the Company to remove its poles. After a hearing and submission of legal memoranda, the Board voted, on April 22nd, to remove the poles.

The Company then brought this action, seeking a declaration that it was entitled under state law to maintain the poles *in situ,* and requesting damages, injunctive relief, and attorneys' fees, pursuant to 42 U.S.C. § 1983. On May 6, 1987, Judge McNaught refused to grant a temporary restraining order and, the next day, Judge Keeton denied the motion for a preliminary injunction. Both judges concluded that the Company had demonstrated neither irreparable harm nor a likelihood of success on the merits.

### II.

The principal question on appeal is whether the Company sufficiently demonstrated that it would suffer irreparable harm if the injunction were not granted. The first ground urged is that any restraint on any interest in real property is per se irreparable injury. This argument confuses permanent alienation or destruction of real property, which is incapable of being reconveyed or restored, with a temporary action subject to reversal with compensation for loss suffered during the period of deprivation. Showing the irreplaceability and uniqueness of real property in the former case is also a showing of the irreparable nature of the harm. In the case at bar, however, if the Company were eventually to prevail, the permit could be reinstated and the poles reinstalled. There is no suggestion that the precise locations would be unavailable, nor is there any allegation or showing that the Company would be unable to recover the cost of the poles, equipment, and installation.

The Company's argument on this point is ill-supported. It relies principally on cases like *Crowley v. J.C. Ryan Construction, Inc.,* 356 Mass. 31, 247 N.E.2d 714 (1969), which dealt with an infringement of an easement. Easements are interests, the Company notes, recognized in Massachu-

setts law as akin to permits.[1] (Main brief, p. 40.) In *Crowley*, the Massachusetts Supreme Judicial Court upheld a permanent injunction requiring plaintiff's neighbor to undo his unilateral raising of the surface of a roadway between the two as to which each had an easement of passage. The case is relevant to this one only in that if the Company finally prevails, it will be entitled to an injunction ordering the Town to restore the poles and sirens.

■ The Company's second contention is that it made a sufficient showing of irreparable harm by alleging a deprivation of constitutional right. Cases so holding, however, are almost entirely restricted to cases involving alleged infringements of free speech, association, privacy or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief. We have even gone so far as to say, in *Rushia v. Town of Ashburnham*, 701 F.2d 7, 10 (1st Cir.1983), that "the fact that [plaintiff] is asserting First Amendment rights does not automatically require a finding of irreparable injury." The alleged denial of procedural due process, without more, does not automatically trigger such a finding. Moreover, as we hold below, the allegations fail as a matter of law to comprise a cause of action for deprivation of a constitutional right.

■ The Company's more substantial argument is that "the likely loss is not readily susceptible of calculation and likely would not be recovered from the defendants." Its reasoning is that in its effort to bring the Seabrook facility to the point where it can begin operations, its emergency procedure plan must be approved by the Nuclear Regulatory Commission (NRC) before the NRC will issue an operating license, and that West Newbury's permit for five poles and sirens is a key element of that plan. If, therefore, the removal of the poles were to be an identifiable cause of NRC disapproval, thus causing delay in commencing operations, the possible loss to the company of multiple hundreds of millions or even billions of dollars would be far beyond the ability of the Town to pay.

The problem with this argument lies with the absence of the necessary predicate, a showing that there is a likelihood of delay in operations being caused by the Town's action. We have searched the record and have found no such showing. The four affidavits submitted by the Company show only that the pole-siren system was chosen as the optimal evacuation warning method, that appropriate sites were selected, and that $75,000 was spent in purchase and installation. There are no facts alleged which demonstrate that a present lack of sirens in West Newbury would have any effect on the NRC's decision, let alone dispositive effect. There is even the suggestion that alternative sitings "would have been arranged" if the Town had not agreed to the particular sites involved here. (A62, Affidavit of David Keast.) There was the candid statement of the Company representative at the hearing on the motion for preliminary injunction that "we cannot come to you and say irreparable harm, bang, in the classic sense ... because I can't represent to you that, absent these poles, the Commission will withhold ... [the] license. There are, frankly, technological fixes, portable sirens, that sort of thing, that can be utilized to provide the reasonable assurance, which is the standard under which the Commission operates." (A. 142.) Moreover, sirens might not even be necessary for NRC approval. As of the time of submission of the Company's main brief, a rule had been proposed by the Commission "uncoupling the siren poles from the licensing effort." (Main brief, p. 19, n. 10.)

Perhaps even more important is the lack of any indication that the merits of this case would not be decided before the critical time for the NRC's decision as to an operating license. The district court denied the motion for preliminary injunction on May 7, 1987. Nearly half a year has since

---

1. We find it difficult, in light of this observation, to understand the following statement in the Company's reply brief: "Defendants' half-hearted suggestion that what is at issue is an easement ... is just plain wrong." (Page 4, n. 4.)

elapsed, within which time it might be presumed that decision could have been reached on the merits. Perhaps of even greater weight is the fact that even as of the time when the Company's reply brief was submitted to us, the Company had no emergency plan on file with the Nuclear Regulatory Commission. (Reply brief, p. 7, n. 6.)

All of these considerations convince us that the prospects of any irreparable damage were speculative. Speculative injury does not constitute a showing of irreparable harm. *See, e.g., Massachusetts Coalition of Citizens with Disabilities v. Civil Defense Agency and Office of Emergency Preparedness of Massachusetts,* 649 F.2d 71, 74 (1st Cir.1981) ("mere possibility" of threat insufficient); *Goldie's Bookstore v. Superior Court of California,* 739 F.2d 466, 472 (9th Cir.1984); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at 436–37 (1973). We therefore hold that the district court did not err or abuse its discretion in ruling that the Company had not made a sufficient showing of the likelihood of irreparable damage.

### III.

Because of our analysis as to irreparable harm, we need not reach the question of likelihood of success on the merits. Yet it is an additional criterion, generally required, and "has loomed large in cases before this court." *Auburn News Co. v. Providence Journal Co.,* 659 F.2d 273, 277 (1st Cir.1981). *See also Lancor v. Lebanon Housing Authority,* 760 F.2d 361, 362 (1st Cir.1985) ("The probability-of-success component in the past has been regarded by us as critical.") As an independent ground for decision, therefore, we also hold that the district court did not err or abuse its discretion in ruling that the Company had not made a sufficient showing of likelihood of success on the merits.

a. The Company's State Law Claim for Declaratory Relief

The Company claims, based on *New England Power Co. v. Amesbury,* 389 Mass. 69, 449 N.E.2d 648 (1983), that the Town may not revoke the permits where the Company has acted in reliance on them. In *Amesbury,* however, the original actions of the selectmen were valid. No authority has been cited for the proposition that a municipality is estopped from nullifying an action invalid from the beginning. Indeed, the Company acknowledges that "reliance cannot cure action that was *ultra vires."* (Reply brief, p. 12.)

Thus, if the selectmen had no authority to issue the permits in the first instance, then the Company's reliance thereon is arguably not of legal significance. The Company advances two bases of authority for the issuance of the 1984 permit by the Town's Board of Selectmen. The first is M.G.L. c. 166, § 21 and § 22. Section 21 gives authority to utilities to construct poles "necessary to sustain or protect the wires of its lines [for the transmission of electricity]." Section 22 sets forth the procedure governing the issuance of location permits for such transmission poles. The function of the poles at issue in this case is to transmit not the "electricity for lighting, heating or power" referred to in section 21, but rather, the sound of warning sirens. The Company attempts to bring this within a broad reading of section 21 by saying that the poles were erected "in connection with the efforts of Public Service and others to transmit electricity from Seabrook Station into the Massachusetts power grid." Main brief, p. 18.

The Town responds by stressing the lack of fit between the statutory language and the purpose of the permits, and by citing the history of the statute. That history is characterized by incremental amendments keeping pace with evolving technology, broadening the authorized uses of poles to include not only the originally envisioned telegraph lines, but also telephone lines, then electricity for lighting, then electricity for heating, then lines for railways, and finally television lines. The Town argues that this history, where the legislature has acted with such incremental specificity, indicates that the statute is not to be expansively interpreted.

As to this issue, both statutory language and legislative treatment of pole use authorizations militate against the Company's position. We observe in addition that the

five poles in this case, perhaps twice the height of ordinary poles, and constituting no part of a "transmission line" as it is commonly understood, arguably differ significantly from the prior statutorily authorized uses of poles under ch. 166, § 21.[2]

■ In the alternative, the Company argues that the selectmen properly granted the permits pursuant to their "inherent power" under M.G.L. c. 40, § 3. This section, so far as is pertinent to this issue, authorizes "selectmen ... duly authorized" to convey by deed town real estate; authorizes selectmen to lease for not more than ten years a public building; authorizes a *town* to make necessary orders "for the disposal or use of its corporate property"; and states that all real estate not placed in the charge of any particular board or officer "shall be under the control of the selectmen." The Company asserts that the pole permits in this case are merely a form of "control" of property, a power given in the clause last quoted to the selectmen. It reasons that the statute limits this power only by the first two clauses—where either a deed or a lease for more than ten years must be authorized by town vote. It equates a pole permit with authorizing a charity to hold a benefit in the town hall or to conduct bingo games. *See, e.g., Worden v. New Bedford*, 131 Mass. 23 (1881) (town committee held authorized to let rooms in public building to a poultry association).

The Town points out that the permits in question were issued specifically under the authority of Chapter 166 and that there was never any invocation of other authority. The authority allegedly granted to the selectmen by section 3 is, in addition, discretionary, and there has been no showing of any explicit reliance thereon. The Town also argues that, in any event, c. 40, § 3 does not give power to a board of selectmen to give what is in legal effect an easement for the life of Seabrook to maintain poles in the five locations. The granting of such an interest, it argues, is a

"disposition or use" of property reserved to a town. It cites, most pertinently, *Harris v. Wayland*, 392 Mass. 237, 243, 466 N.E. 2d 822 (1984) (section 3 does not become operative until transfer has been approved by town vote); *Oliver v. Mattapoisett*, 17 Mass.App.Ct. 286, 288, 457 N.E.2d 679 (1983) ("Except as qualified by other statutes, a majority vote of a town is sufficient to grant an easement or convey any other interest in land."); *Bowers v. Board of Appeals of Marshfield*, 16 Mass.App.Ct. 29, 32, 448 N.E.2d 1293 (1983) ("[T]he perpetual incumbrance imposed upon the six lots by the then selectmen was an action which they were powerless to take.")

The question of where along the continuum of actions involving town property the pole permits lie may very well be a close one. It is not clear whether the permits are the sort of conveyance that needs to be approved by the Town as a whole. But we sense that Massachusetts law rather jealously reserves for towns, as opposed to selectmen acting without particular authorization, the power to impose on themselves significant long-term restrictions of use of real property. In any event, we cannot say that the Company has tipped the scales in its favor by showing a likelihood of success on this issue.

It cannot with confidence be said that the selectmen were authorized to grant the permits under either statutory section cited. Thus, the Company's reliance on the permits is of no note, because it was relying on an action taken *ultra vires*. *Cf. Meader v. West Newbury*, 256 Mass. 37, 39, 152 N.E. 315 (1926) ("A person who enters into a contract with a public officer is bound at his peril to ascertain the extent of authority of such an officer with whom he deals."). We have been alerted to no case where reliance was sufficient to establish a right to the property conveyance where the conveyance was not in the first instance legally authorized. The district court did not err in its holding.

**2.** The Company makes a secondary argument based on the fact that the poles also support wires "transmitting electricity" to "trickle charge" the batteries powering the sirens. But the purpose of those wires is to serve the sirens on the poles, and cannot convert the purpose of

the poles or sirens themselves into that of serving the electrical "trickle" lines. The sirens and poles are not structures "*for* the transmission of electricity" within the meaning of the statute, and thus the trickle charger is not a transmission line within the meaning of that law.

### b. The Company's Claim for Relief Under 42 U.S.C. § 1983

Rather inexplicably, the Company seeks to invoke 42 U.S.C. § 1983 as an alternative ground for relief. It asserts that it was facing a threat of deprivation of property without due process of law when the Town's board of selectmen, having determined the permits to have been invalid *ab initio*, stated its intent to remove the poles. As we said in *Chiplin Enterprises v. City of Lebanon*, 712 F.2d 1524, 1528 (1st Cir.1983), "[a] mere bad faith refusal to follow state law in such local administration matters [here, building permit proceedings] simply does not amount to a deprivation of due process where the state courts are available to correct the error."

We have also made this point in *Creative Environments, Inc. v. Estabrook*, 680 F.2d 822 (1st Cir.1981), *Roy v. City of Augusta, Maine*, 712 F.2d 1517 (1st Cir.1983), and *Chongris v. Board of Appeals of Town of Andover*, 811 F.2d 36 (1st Cir.1987). The Company's belated efforts to distinguish these cases merit no discussion. There clearly is no likelihood of success as to this claim.

*Affirmed.*