UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2483

AMY COHEN, ET AL.,

Plaintiffs, Appellees,

v.

BROWN UNIVERSITY, ET AL.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Raymond J. Pettine, Senior U.S. District Judge]

Before

Selya, Cyr and Stahl, Circuit Judges.

Jeffrey S. Michaelson, with whom Julius C. Michaelson,

Michaelson & Michaelson, and Beverly E. Ledbetter were on brief,

for appellants.
Lynette Labinger, with whom Roney & Labinger, Sandra L.

Duggan, Kronfeld, Newberg & Duggan, Arthur H. Bryant, Trial

Lawyers for Public Justice, P.C., Raymond Marcaccio, Blish &

Cavanagh, Amato A. DeLuca, and Mandell, DeLuca & Schwartz, Ltd.

were on brief, for appellees.
Linda S. Stein, Margaret M. Clark, Steptoe & Johnson, Ellen

J. Vargyas, and Deborah L. Brake on brief for National Women's

Law Center, Woman's Sports Foundation, and National Association
for Girls and Women in Sport, amici curiae.

April 16, 1993

SELYA, Circuit Judge. In this watershed case,
SELYA, Circuit Judge.

defendants-appellants Brown University, Vartan Gregorian, and

David Roach appeal from the district court's issuance of a

preliminary injunction ordering Brown to reinstate its women's

gymnastics and volleyball programs to full intercollegiate

varsity status pending the resolution of a Title IX claim.1 See

Cohen v. Brown Univ., 809 F. Supp. 978 (D.R.I. 1992). After

mapping Title IX's rugged legal terrain and cutting a passable

swath through the factual thicket that overspreads the parties'

arguments, we affirm.

I. BROWN ATHLETICS: AN OVERVIEW

College athletics, particularly in the realm of

football and basketball, has traditionally occupied a prominent

role in American sports and American society. For college

students, athletics offers an opportunity to exacuate leadership

skills, learn teamwork, build self-confidence, and perfect self-

discipline. In addition, for many student-athletes, physical

skills are a passport to college admissions and scholarships,

allowing them to attend otherwise inaccessible schools. These

opportunities, and the lessons learned on the playing fields, are

invaluable in attaining career and life successes in and out of

professional sports.

The highway of opportunity runs in both directions.

1The individual defendants are, respectively, the President
and Athletic Director of the University. Each is sued in his
official capacity. For ease in reference, we discuss this appeal
as if Brown was the sole defendant and appellant. Nonetheless,
our opinion applies equally to all parties.

2

Not only student-athletes, but universities, too, benefit from

the magic of intercollegiate sports. Successful teams generate

television revenues and gate receipts which often fund

significant percentages of a university's overall athletic

program, offering students the opportunity to partake of sports

that are not financially self-sustaining. Even those

institutions whose teams do not fill the grandstands of cavernous

stadiums or attract national television exposure benefit from

increased student and alumni cohesion and the support it

engenders. Thus, universities nurture the legends, great or

small, inhering in their athletic past, polishing the hardware

that adorns field-house trophy cases and reliving heroic exploits

in the pages of alumni magazines.

In these terms, Brown will never be confused with Notre

Dame or the more muscular members of the Big Ten. Although its

football team did play in the 1916 Rose Bowl and its men's

basketball team won the Ivy League championship as recently as

1986, Brown's athletic program has only occasionally achieved

national prominence or, for that matter, enjoyed sustained

success.2 Moreover, at Brown, as at most schools, women are a

relatively inconspicuous part of the storied athletic past.

Historically, colleges limited athletics to the male sphere,

leaving those few women's teams that sprouted to scrounge for

resources.

2We note, not without a certain irony, that the now-demoted
women's volleyball and gymnastics teams won Ivy League
championships in 1988 and 1990, respectively.

3

The absence of women's athletics at Brown was, until

1970, an ineluctable consequence of the absence of women; Brown

sponsored a women's college Pembroke but did not itself admit

women. In 1971, Brown subsumed Pembroke. Brown promptly

upgraded Pembroke's rather primitive athletic offerings so that

by 1977 there were fourteen women's varsity teams. In subsequent

years, Brown added only one distaff team: winter track. Hence,

in the 1991-92 academic year, Brown fielded fifteen women's

varsity teams one fewer than the number of men's varsity teams.

II. THE PLAINTIFF CLASS

In the spring of 1991, Brown announced that it, like

many other schools, was in a financial bind, and that, as a belt-

tightening measure, it planned to drop four sports from its

intercollegiate varsity athletic roster: women's volleyball and

gymnastics, men's golf and water polo. The University permitted

the teams to continue playing as "intercollegiate clubs," a

status that allowed them to compete against varsity teams from

other colleges,3 but cut off financial subsidies and support

services routinely available to varsity teams (e.g., salaried

coaches, access to prime facilities, preferred practice time,

medical trainers, clerical assistance, office support, admission

preferences, and the like). Brown estimated that eliminating

3As a practical matter, many schools with varsity squads are
reluctant to compete against club teams. This case aptly
illustrates the point. As soon as Brown demoted its women's
volleyball team from varsity to club status, Northeastern
University and West Point declined to include Brown on future
volleyball schedules. See Cohen, 809 F. Supp. at 993.

4

these four varsity teams would save $77,813 per annum, broken

down as follows: women's volleyball, $37,127; women's

gymnastics, $24,901; men's water polo, $9,250; men's golf,

$6,545.

Before the cuts, Brown athletics offered an aggregate

of 328 varsity slots for female athletes and 566 varsity slots

for male athletes. Thus, women had 36.7% of the athletic

opportunities and men 63.3%. Abolishing the four varsity teams

took substantially more dollars from the women's athletic budget

than from the men's budget, but did not materially affect the

athletic opportunity ratios; women retained 36.6% of the

opportunities and men 63.4%. At that time (and for a number of

years prior thereto), Brown's student body comprised

approximately 52% men and 48% women.

Following Brown's announcement of the cutbacks,

disappointed members of the women's volleyball and gymnastics

teams brought suit. They proceeded on an implied cause of action

under Title IX, 20 U.S.C. 1681-1688 (1988). See Franklin v.

Gwinnett County Pub. Sch., 112 S. Ct. 1028, 1032 (1992)

(recognizing implied private right of action under Title IX);

Cannon v. University of Chicago, 441 U.S. 677, 717 (1979) (same);

see also Cannon, 441 U.S. at 687 n.8 (holding that exhaustion of

administrative remedies is not a prerequisite to a Title IX

suit). The plaintiffs charged that Brown's athletic arrangements

violated Title IX's ban on gender-based discrimination, a

violation that was allegedly exacerbated by Brown's decision to

5

devalue the two women's programs without first making sufficient

reductions in men's activities or, in the alternative, adding

other women's teams to compensate for the loss.

On plaintiffs' motion, the district court certified a

class of "all present and future Brown University women students

and potential students who participate, seek to participate,

and/or are deterred from participating in intercollegiate

athletics funded by Brown." And, after hearing fourteen days of

testimony from twenty witnesses, the judge granted a preliminary

injunction requiring Brown to reinstate the two women's teams

pending the outcome of a full trial on the merits. See Cohen,

809 F. Supp. at 1001. We stayed execution of the order and

expedited Brown's appeal.

III. TITLE IX AND COLLEGIATE ATHLETICS

Title IX prohibits gender-based discrimination by

educational institutions receiving federal financial support in

practice, the vast majority of all accredited colleges and

universities. The statute sketches wide policy lines, leaving

the details to regulating agencies. Since this appeal demands

that we invade terra incognita,4 we carefully recount the

4Although there has been a spate of sports-related Title IX
suits during the last two years, see Andrew Blum, Athletics in

the Courts, Nat'l L.J., Apr. 5, 1993, at 1, few have been fully

litigated. See, e.g., Carol Herwig, Massachusetts Reinstates

Women's Sports, USA Today, Oct. 22, 1992, at 14C (announcing

agreement to reinstate three women's teams at the University of
Massachusetts and reporting the school's intention to become "the
first university in the country to come into full compliance with
Title IX"). While the case we decide today is apparently the

6

developments leading to the present version of Title IX and then

examine the pertinent statutory and regulatory language.

A. Scope of Title IX.

At its inception, the broad proscriptive language of

Title IX caused considerable consternation in the academic world.

The academy's anxiety chiefly centered around identifying which

individual programs, particularly in terms of athletics, might

come within the scope of the discrimination provision, and,

relatedly, how the government would determine compliance. The

gridiron fueled these concerns: for many schools, the men's

football budget far exceeded that of any other sport, and men's

athletics as a whole received the lion's share of dedicated

resources a share that, typically, was vastly disproportionate

to the percentage of men in the student body.

Part of the confusion about the scope of Title IX's

coverage and the acceptable avenues of compliance arose from the

absence of secondary legislative materials. Congress included no

committee report with the final bill and there were apparently

only two mentions of intercollegiate athletics during the

congressional debate. See 118 Cong. Rec. 5,807 (1972) (statement

of Sen. Bayh on privacy in athletic facilities); 117 Cong. Rec.

30,407 (1971) (statement of Sen. Bayh noting that proposed Title

first of these to reach the courts of appeals, others are
pending. See, e.g., Roberts v. Colorado State Univ., No. 93-1052

(10th Cir. 1993) (not yet argued); Cook v. Colgate Univ., No. 92-

9175 (2d Cir. 1993) (argued Feb. 26, 1993).

7

IX will not require gender-blended football teams).

Nevertheless, under congressional direction to implement Title

IX, the Secretary of Health, Education and Welfare (HEW)

promulgated regulations in 1975 which included specific

provisions for college athletics. Four years later, HEW's Office

of Civil Rights (OCR) added another layer of regulatory exegesis

when, after notice and comment, it published a "Policy

Interpretation" that offered a more detailed measure of equal

athletic opportunity.

In 1984, the Supreme Court radically altered the

contemporary reading of Title IX. The Court held that Title IX

was "program-specific," so that its tenets applied only to the

program(s) which actually received federal funds and not to the

rest of the university. Grove City College v. Bell, 465 U.S.

555, 574 (1984). Because few athletic departments are direct

recipients of federal funds most federal money for universities

is channelled through financial aid offices or invested directly

in research grants Grove City cabined Title IX and placed

virtually all collegiate athletic programs beyond its reach.5

In response to Grove City, Congress scrapped the

program-specific approach and reinstated an institution-wide

application of Title IX by passing the Civil Rights Restoration

5Following the Court's decision in Grove City, the United

States Department of Education (which by then had been spun off
from HEW, see infra Part III(C)) dropped or curtailed seventy-

nine ongoing Title IX cases. See Statements on Civil Rights

Restoration Act, Daily Lab. Rep. (BNA) No. 53, at D1 (Mar. 20,

1981).

8

Act of 1987, 20 U.S.C. 1687 (1988). The Restoration Act

required that if any arm of an educational institution received

federal funds, the institution as a whole must comply with Title

IX's provisions. See id.; see also S. Rep. No. 64, 100th Cong.,

2d Sess. 4 (1988), reprinted in 1988 U.S.C.C.A.N. 3, 6

(explaining that Congress wanted to prohibit discrimination

throughout an institution if the institution received any federal

funds). Although the Restoration Act does not specifically

mention sports, the record of the floor debate leaves little

doubt that the enactment was aimed, in part, at creating a more

level playing field for female athletes. See, e.g., 130 Cong.

Rec. S12,642 (daily ed. Oct. 2, 1984) (statement of Sen. Byrd

decrying past discrimination against female athletes); 130 Cong.

Rec. S11,253 (daily ed. Sept. 17, 1984) (statement of Sen. Hatch

regarding importance of Title IX to ensuring development of women

athletes); 130 Cong. Rec. S2,267 (daily ed. Mar. 2, 1984)

(statement of Sen. Riegle noting extensive evidence of sex

discrimination in education and athletics).

The appellants do not challenge the district court's

finding that, under existing law, Brown's athletic department is

subject to Title IX. Accordingly, we devote the remainder of

Part III to deterrating the meaning of Title IX, looking first at

the statute and then at the regulations.

B. Statutory Framework.

Title IX, like the Restoration Act, does not explicitly

9

treat college athletics.6 Rather, the statute's heart is a

broad prohibition of gender-based discrimination in all

programmatic aspects of educational institutions:

No person in the United States shall, on
the basis of sex, be excluded from
participation in, be denied the benefits of,
or be subjected to discrimination under any
education program or activity receiving
Federal financial assistance . . . .

20 U.S.C. 1681(a) (1988). After listing a number of exempt

organizations, section 1681 makes clear that, while Title IX

prohibits discrimination, it does not mandate strict numerical

equality between the gender balance of a college's athletic

program and the gender balance of its student body. Thus,

section 1681(a) shall not

be interpreted to require any educational
institution to grant preferential or
disparate treatment to the members of one sex
on account of an imbalance which may exist
with respect to the total number or
percentage of persons of that sex
participating in or receiving the benefits of
any federally supported program or activity,
in comparison with the total number or
percentage of persons of that sex in any
community, State, section, or other area:
Provided, That this subsection shall not be

construed to prevent the consideration in any
hearing or proceeding under this chapter of
statistical evidence tending to show that
such an imbalance exists with respect to the
participation in, or receipt of the benefits
of, any such program or activity by the
members of one sex.

6This lacuna apparently results from a political compromise.
After the Conference Committee deleted an amendment to Title IX
that would have exempted "revenue-producing" athletics, Congress
asked the Secretary of HEW to provide regulations specifically
governing athletics. See 44 Fed. Reg. 71,413 (1979).

10

20 U.S.C. 1681(b) (1988). Put another way, a court assessing

Title IX compliance may not find a violation solely because there

is a disparity between the gender composition of an educational

institution's student constituency, on the one hand, and its

athletic programs, on the other hand.

That is not to say, however, that evidence of such a

disparity is irrelevant. Quite the contrary: under the proviso

contained in section 1681(b), a Title IX plaintiff in an athletic

discrimination suit must accompany statistical evidence of

disparate impact with some further evidence of discrimination,

such as unmet needamongst the members of thedisadvantaged gender.

C. Regulatory Framework.

As we mentioned above, the Secretary of HEW, following

Congress's instructions, promulgated regulations implementing

Title IX in the pre-Grove City era. See 40 Fed. Reg. 24,128

(1975). Thereafter, in 1979, Congress split HEW into the

Department of Health and Human Services (HHS) and the Department

of Education (DED). See 20 U.S.C. 3401-3510 (1988). In a

wonderful example of bureaucratic muddle, the existing Title IX

regulations were left within HHS's arsenal while, at the same

time, DED replicated them as part of its own regulatory

armamentarium. Compare 45 C.F.R. 86 (1992) (HHS regulations)

with 34 C.F.R. 106 (1992) (DED regulations). Both sets of

regulations were still in effect when the Restoration Act passed.

They are identical, save only for changes in nomenclature

reflecting the reorganization of the federal bureaucracy.

11

In short, like pretenders to the emirate of a deceased

sheik, both HHS and DED lay an hereditary claim to this oasis

which arises from the regulatory desert, asserting authority to

enforce Title IX. Nevertheless, DED is the principle locus of

ongoing enforcement activity. See 20 U.S.C. 3441(a)(1)

(transferring all education functions of HEW to DED); see also 20

U.S.C. 3441(a)(3) (transferring education-related OCR work to

DED). Therefore, like the parties, we treat DED, acting through

its OCR, as the administrative agency charged with administering

Title IX.7

Recognizing the agency's role has important practical

and legal consequences. Although DED is not a party to this

appeal, we must accord its interpretation of Title IX appreciable

deference. See Chevron U.S.A. Inc. v. Natural Resources Defense

Council, Inc., 467 U.S. 837, 844 (1984); see also Udall v.

Tallman, 380 U.S. 1, 16 (1965) (noting that the Supreme Court

"gives great deference to the interpretation given the statute by

the officers or agency charged with its administration"). The

degree of deference is particularly high in Title IX cases

because Congress explicitly delegated to the agency the task of

prescribing standards for athletic programs under Title IX. See

Pub. L. No. 93-380, 844, 88 Stat. 612 (1974); see also Chevron,

467 U.S. at 844 (holding that where Congress has explicitly

7From this point forward, we use the acronym "OCR" to refer
to DED's Office of Civil Rights which took on the education-
related portfolio of HEW's Office of Civil Rights in May, 1980.
See 20 U.S.C. 3441(a)(3).

12

delegated responsibility to an agency, the regulation deserves

"controlling weight"); Batterton v. Francis, 432 U.S. 416, 425

(1977); Alvarez-Flores v. INS, 909 F.2d 1, 3 (1st Cir. 1990).

It is against this backdrop that we scrutinize the

regulations and the Policy Interpretation.

1. The Regulations. DED's regulations begin by
1. The Regulations.

detailing Title IX's application to college athletics.8 The

regulations also recognize, however, that an athletic program may

consist of gender-segregated teams as long as one of two

conditions is met: either the sport in which the team competes

is a contact sport or the institution offers comparable teams in

the sport to both genders. See 34 C.F.R. 106.41(b).

Finally, whether teams are segregated by sex or not,

the school must provide gender-blind equality of opportunity to

its student body. The regulations offer a non-exclusive

compendium of ten factors which OCR will consider in assessing

compliance with this mandate:

(1) Whether the selection of sports and
levels of competition effectively accommodate
the interests and abilities of members of

8The regulations provide:

No person shall, on the basis of sex, be
excluded from participation in, be denied the
benefits of, be treated differently from
another person or otherwise be discriminated
against in any interscholastic,
intercollegiate, club or intramural athletics
offered by a recipient, and no recipient
shall provide any such athletics separately
on such basis.

34 C.F.R. 106.41(a) (1992).

13

both sexes;
(2) The provision of equipment and
supplies;
(3) Scheduling of games and practice
time;
(4) Travel and per diem allowance;
(5) Opportunity to receive coaching and
academic tutoring;
(6) Assignment and compensation of
coaches and tutors;
(7) Provision of locker rooms, practice
and competitive facilities;
(8) Provision of medical and training
facilities and services;
(9) Provision of housing and dining
facilities and services;
(10) Publicity.

34 C.F.R. 106.41(c) (1992).9 The district court rested its

preliminary injunction on the first of these ten areas of

inquiry: Brown's failure effectively to accommodate the

interests and abilities of female students in the selection and

level of sports. See Cohen, 809 F. Supp. at 994. Hence, this

area is the most critical in terms of evaluating the charges

against Brown (although it is also the most difficult to

measure).

2. The Policy Interpretation. In the three years next
2. The Policy Interpretation.

following the initial issuance of the regulations, HEW received

9The same regulation also stipulates that:

Unequal aggregate expenditures for members of
each sex or unequal expenditures for male and
female teams if a recipient operates or
sponsors separate teams will not constitute
noncompliance with this section, but [DED]
may consider the failure to provide necessary
funds for teams for one sex in assessing
equality of opportunity for members of each
sex.

34 C.F.R. 106.41(c) (1992).

14

over one hundred discrimination complaints involving more than

fifty schools. In order to encourage self-policing and thereby

winnow complaints, HEW proposed a Policy Interpretation. See 43

Fed. Reg. 58,070 (1978). It then promulgated the Policy

Interpretation in final form, see 44 Fed. Reg. 71,413 (1979), a

matter of months before the effective date of the statute through

which Congress, emulating King Solomon, split HEW. The parties

are in agreement that, at DED's birth, it clutched the Policy

Interpretation, and, as a practical matter, that appears to be

the case.10 See, e.g., DED, Title IX Athletics Investigator's

Manual 1, 2 (1990) (Manual); see also Complaint Letter from

Regional Civil Rights Director, DED, to Dr. Martin Massengale,

Chancellor, Univ. of Nebraska (July 10, 1989) (noting that DED

"ha[s] followed the directions provided in the Policy

Interpretation"); Complaint Letter from Regional Civil Rights

Director, DED, to Dr. Charles A. Walker, Chancellor, Univ. of

Arkansas (Sept. 1, 1989) (same). Although we can find no record

that DED formally adopted the Policy Interpretation, we see no

point to splitting the hair, particularly where the parties have

not asked us to do so. Because this document is a considered

interpretation of the regulation, we cede it substantial

deference. See Martin v. OSHRC, 111 S. Ct. 1171, 1175-76 (1991);

10Congress clearly assigned HEW's regulatory duties in
education to the nascent DED. See 20 U.S.C. 3441. Moreover,

in taking up its mantle, DED adopted exactly the regulation which
the Policy Interpretation purported to interpret sending an
unmistakably clear signal of the agency's satisfaction with the
Policy Interpretation.

15

Gardebring v. Jenkins, 485 U.S. 415, 430 (1988).

In line with the Supreme Court's direction that, "if we

are to give [Title IX] the scope that its origins dictate, we

must accord it a sweep as broad as its language," North Haven Bd.

of Educ. v. Bell, 456 U.S. 512, 521 (1982) (quoting United States

v. Price, 383 U.S. 787, 801 (1966)) (collecting cases) (brackets

in original), the Policy Interpretation limns three major areas

of regulatory compliance:11 "Athletic Financial Assistance

(Scholarships)," see 34 C.F.R. 106.37(c); "Equivalence in Other

Athletic Benefits and Opportunities," see 34 C.F.R.

106.41(c)(2)-(10); and "Effective Accommodation of Student

Interests and Abilities," see 34 C.F.R. 106.41(c)(1). The

court below, see Cohen, 809 F. Supp. at 989, and a number of

other district courts, see, e.g., Roberts v. Colorado State

Univ., F. Supp. , (D. Colo. 1993) [No. 92-Z-1310, slip

op. at 3]; Favia v. Indiana Univ. of Pa., No. 92-2045, 1992 WL

436239, at *7 (W.D. Pa. Feb. 4, 1993), have adopted this

formulation and ruled that a university violates Title IX if it

ineffectively accommodates student interests and abilities

regardless of its performance in other Title IX areas.

Equal opportunity to participate lies at the core of

Title IX's purpose. Because the third compliance area delineates

this heartland, we agree with the district courts that have so

ruled and hold that, with regard to the effective accommodation

11The Manual divides Title IX coverage into the same three
areas and notes that "an investigation may be limited to less
than all three of these major areas." Manual at 7.

16

of students' interests and abilities, an institution can violate

Title IX even if it meets the "financial assistance" and

"athletic equivalence" standards. In other words, an institution

that offers women a smaller number of athletic opportunities than

the statute requires may not rectify that violation simply by

lavishing more resources on those women or achieving equivalence

in other respects.12

3. Measuring Effective Accommodation. The parties
3. Measuring Effective Accommodation.

agree that the third compliance area is the field on which this

appeal must be fought. In surveying the dimensions of this

battleground, that is, whether an athletic program effectively

accommodates students' interests and abilities, the Policy

Interpretation maps a trinitarian model under which the

university must meet at least one of three benchmarks:

(1) Whether intercollegiate level
participation opportunities for male and
female students are provided in numbers
substantially proportionate to their
respective enrollments; or
(2) Where the members of one sex have
been and are underrepresented among
intercollegiate athletes, whether the
institution can show a history and continuing
practice of program expansion which is
demonstrably responsive to the developing

12In any event, both the financial assistance and athletic
equivalence standards are inapposite for present purposes. As to
the former, Brown does not confer athletic scholarships and the
plaintiffs do not allege that Brown has discriminated by gender
in distributing other financial aid. As to the latter, the
district court made only preliminary findings, see Cohen, 809 F.

Supp. at 994-97, on the explicit understanding that it would
revisit compliance vel non with the athletic equivalence standard

at trial. Id. at 997.

17

interest and abilities of the members of that
sex; or
(3) Where the members of one sex are
underrepresented among intercollegiate
athletes, and the institution cannot show a
continuing practice of program expansion such
as that cited above, whether it can be
demonstrated that the interests and abilities
of the members of that sex have been fully
and effectively accommodated by the present
program.

44 Fed. Reg. at 71,418. The first benchmark furnishes a safe

harbor for those institutions that have distributed athletic

opportunities in numbers "substantially proportionate" to the

gender composition of their student bodies. Thus, a university

which does not wish to engage in extensive compliance analysis

may stay on the sunny side of Title IX simply by maintaining

gender parity between its student body and its athletic lineup.

The second and third parts of the accommodation test

recognize that there are circumstances under which, as a

practical matter, something short of this proportionality is a

satisfactory proxy for gender balance. For example, so long as a

university is continually expanding athletic opportunities in an

ongoing effort to meet the needs of the underrepresented gender,

and persists in this approach as interest and ability levels in

its student body and secondary feeder schools rise, benchmark two

is satisfied and Title IX does not require that the university

leap to complete gender parity in a single bound. Or, if a

school has a student body in which one sex is demonstrably less

interested in athletics, Title IX does not require that the

18

school create teams for, or rain money upon, otherwise

disinterested students; rather, the third benchmark is satisfied

if the underrepresented sex's discernible interests are fully and

effectively accommodated.13

It seems unlikely, even in this day and age, that the

athletic establishments of many coeducational universities

reflect the gender balance of their student bodies.14

Similarly, the recent boom in Title IX suits suggests that, in an

era of fiscal austerity, few universities are prone to expand

athletic opportunities. It is not surprising, then, that schools

more often than not attempt to manage the rigors of Title IX by

satisfying the interests and abilities of the underrepresented

gender, that is, by meeting the third benchmark of the

accommodation test. Yet, this benchmark sets a high standard:

it demands not merely some accommodation, but full and effective

13OCR also lists a series of illustrative justifications for
the disparate treatment of men's and women's athletic teams,
including (1) sports that require more resources because of the
nature of the game (e.g., contact sports generally require more

equipment), (2) special circumstances, such as an influx of
first-year players, that may require an extraordinary infusion of
resources, (3) special operational expenses (e.g., crowd control

at a basketball tournament), as long as special operational
expense needs are met for both genders and (4) affirmative
measures to remedy past limitations on athletic opportunities for
one gender. 44 Fed. Reg. at 71,415-16.

14Success in this regard is, however, attainable. After
Washington State University was ordered to increase participation
opportunities for women to a level equivalent with the percentage
of female undergraduates, see Blair v. Washington State Univ.,

740 P.2d 1379 (Wash. 1987), the University experienced
considerable success in meeting court-ordered goals. See Mary

Jordan, Only One School Meets Gender Equity Goal, Wash. Post,

June 21, 1992, at D1.

19

accommodation. If there is sufficient interest and ability among

members of the statistically underrepresented gender, not slaked

by existing programs, an institution necessarily fails this prong

of the test.

Although the full-and-effective-accommodation standard

is high, it is not absolute. Even when male athletic

opportunities outnumber female athletic opportunities, and the

university has not met the first benchmark (substantial

statistical proportionality) or the second benchmark (continuing

program expansion) of the accommodation test, the mere fact that

there are some female students interested in a sport does not

ipso facto require the school to provide a varsity team in order

to comply with the third benchmark. Rather, the institution can

satisfy the third benchmark by ensuring participatory

opportunities at the intercollegiate level when, and to the

extent that, there is "sufficient interest and ability among the

members of the excluded sex to sustain a viable team and a

reasonable expectation of intercollegiate competition for that

team . . . ." 44 Fed. Reg. at 71,418. Staying on top of the

problem is not sport for the short-winded: the institution must

remain vigilant, "upgrading the competitive opportunities

available to the historically disadvantaged sex as warranted by

developing abilities among the athletes of that sex," id., until

the opportunities for, and levels of, competition are equivalent

20

by gender.15

Brown argues that DED's Policy Interpretation,

construed as we have just outlined, goes so far afield that it

countervails the enabling legislation. Brown suggests that, to

the extent students' interests in athletics are disproportionate

by gender, colleges should be allowed to meet those interests

incompletely as long as the school's response is in direct

proportion to the comparative levels of interest. Put bluntly,

Brown reads the "full" out of the duty to accommodate "fully and

effectively." It argues instead that an institution

satisfactorily accommodates female athletes if it allocates

athletic opportunities to women in accordance with the ratio of

interested and able women to interested and able men, regardless

of the number of unserved women or the percentage of the student

body that they comprise.

Because this is mountainous terrain, an example may

serve to clarify the distinction between Brown's proposal and our

understanding of the law. Suppose a university (Oooh U.) has a

student body consisting of 1,000 men and 1,000 women, a one to

one ratio. If 500 men and 250 women are able and interested

15If in the course of adding and upgrading teams, a
university attains gender parity between its athletic program and
its student body, it meets the first benchmark of the
accommodation test. But, Title IX does not require that a school
pour ever-increasing sums into its athletic establishment. If a
university prefers to take another route, it can also bring
itself into compliance with the first benchmark of the
accommodation test by subtraction and downgrading, that is, by
reducing opportunities for the overrepresented gender while
keeping opportunities stable for the underrepresented gender (or
reducing them to a much lesser extent).

21

athletes, the ratio of interested men to interested women is two

to one. Brown takes the position that both the actual gender

composition of the student body and whether there is unmet

interest among the underrepresented gender are irrelevant; in

order to satisfy the third benchmark, Oooh U. must only provide

athletic opportunities in line with the two to one interested

athlete ratio, say, 100 slots for men and 50 slots for women.

Under this view, the interest of 200 women would be unmet but

there would be no Title IX violation.

We think that Brown's perception of the Title IX

universe is myopic. The fact that the overrepresented gender is

less than fully accommodated will not, in and of itself, excuse a

shortfall in the provision of opportunities for the

underrepresented gender. Rather, the law requires that, in the

absence of continuing program expansion (benchmark two), schools

either meet benchmark one by providing athletic opportunities in

proportion to the gender composition of the student body (in Oooh

U.'s case, a roughly equal number of slots for men and women, as

the student body is equally divided), or meet benchmark three by

fully accommodating interested athletes among the

underrepresented sex (providing, at Oooh U., 250 slots for

women).16

16Of course, if Oooh U. takes the benchmark three route, it
will also have to provide at least the same number of slots for
men; but, so long as women remain the underrepresented gender and
their interests are fully accommodated, the university can
provide as many (or as few) additional slots for men as it sees
fit.

22

In the final analysis, Brown's view is wrong on two

scores. It is wrong as a matter of law, for DED's Policy

Interpretation, which requires full accommodation of the

underrepresented gender, draws its essence from the statute.

Whether Brown's concept might be thought more attractive, or

whether we, if writing on a pristine page, would craft the

regulation in a manner different than the agency, are not very

important considerations. Because the agency's rendition stands

upon a plausible, if not inevitable, reading of Title IX, we are

obligated to enforce the regulation according to its tenor. See

Chevron, 467 U.S. at 843 n.11 (holding that a "court need not

conclude that the agency construction was the only one it

permissibly could have adopted to uphold [it]") (collecting

cases); Massachusetts v. Secretary of Agric., 984 F.2d 514, 522

(1st Cir. 1993) (similar).

Brown's reading of Title IX is legally flawed for yet

another reason. It proceeds from the premise that the agency's

third benchmark countervails Title IX. But, this particular

imprecation of the third benchmark overlooks the accommodation

test's general purpose: to determine whether a student has been

"excluded from participation in, [or] denied the benefits of" an

athletic program "on the basis of sex . . . ." 20 U.S.C.

1681(a). While any single element of this tripartite test, in

isolation, might not achieve the goal set by the statute, the

test as a whole is reasonably constructed to implement the

statute. No more is exigible. See Chemical Mfrs. Ass'n v.

23

Natural Resources Defense Council, Inc., 470 U.S. 116, 125

(1985).

As it happens, Brown's view is also poor policy for, in

the long run, a rule such as Brown advances would likely make it

more difficult for colleges to ensure that they have complied

with Title IX. Given that the survey of interests and abilities

would begin under circumstances where men's athletic teams have a

considerable head start, such a rule would almost certainly blunt

the exhortation that schools should "take into account the

nationally increasing levels of women's interests and abilities"

and avoid "disadvantag[ing] members of an underrepresented sex .

. . ." 44 Fed. Reg. at 71,417.

Brown's proposal would also aggravate the

quantification problems that are inevitably bound up with Title

IX. Student plaintiffs, who carry the burden of proof on this

issue, as well as universities monitoring self-compliance, would

be required to assess the level of interest in both the male and

female student populations and determine comparatively how

completely the university was serving the interests of each sex.

By contrast, as we read the accommodation test's third benchmark,

it requires a relatively simple assessment of whether there is

unmet need in the underrepresented gender that rises to a level

sufficient to warrant a new team or the upgrading of an existing

team. We think the simpler reading is far more serviceable.

Furthermore, by moving away from OCR's third benchmark,

which focuses on the levels of interest and ability extant in the

24

student body, Brown's theory invites thorny questions as to the

appropriate survey population, whether from the university,

typical feeder schools, or the regional community. In that way,

Brown's proposal would do little more than overcomplicate an

already complex equation.

We will not paint the lily. Brown's approach cannot

withstand scrutiny on either legal or policy grounds. We

conclude that DED's Policy Interpretation means exactly what it

says. This plain meaning is a proper, permissible rendition of

the statute.

IV. THE CONSTITUTIONAL CHALLENGE

We turn now to a series of case-specific issues,

starting with Brown's constitutional challenge to the statutory

scheme.

A. Equal Protection.

Brown asseverates that if the third part of the

accommodation test is read as OCR wrote it to require full and

effective accommodation of the underrepresented gender the test

violates the Fifth Amendment's Equal Protection Clause. We think

not.

Brown assumes that full and effective accommodation

disadvantages male athletes.17 While it might well be that

17In characterizing Title IX as benefitting only women,

Brown takes a rather isthmian view of the world at large. After
all, colleges that have converted from exclusively female
enrollment to coeducational enrollment face situations inverse to
Brown's. In such a setting, the men's athletic program may well
be underdeveloped, or underfunded, or both, while fiscal
retrenchment offers no reprieve. Under these circumstances,

25

more men than women at Brown are currently interested in sports,

Brown points to no evidence in the record that men are any more

likely to engage in athletics than women, absent socialization

and disparate opportunities. In the absence of any proof

supporting Brown's claim, and in view of congressional and

administrative urging that women, given the opportunity, will

naturally participate in athletics in numbers equal to men, we do

not find that the regulation, when read in the common-sense

manner that its language suggests, see supra Part III(C)(3),

offends the Fifth Amendment.

What is more, even if we were to assume, for argument's

sake, that the regulation creates a gender classification slanted

somewhat in favor of women, we would find no constitutional

infirmity. It is clear that Congress has broad powers under the

Fifth Amendment to remedy past discrimination. See, e.g., Metro

Broadcasting, Inc. v. FCC, 110 S. Ct. 2997, 3009 (1990) (noting

that Congress need not make specific findings of discrimination

to grant race-conscious relief); Califano v. Webster, 430 U.S.

313, 317 (1977) (upholding social security wage law that

benefitted women in part because its purpose was "the permissible

one of redressing our society's longstanding disparate treatment

of women"). Despite the little legislative history regarding

discrimination in collegiate athletics that emerged during the

consideration of Title IX, Congress did hold "extensive hearings

Title IX would protect the athletic interests of men as the
underrepresented sex.

26

on higher education" when Title IX was pending, in the course of

which "much testimony was heard with respect to discrimination

against women in higher education." H.R. Rep. No. 554, 92d

Cong., 2d Sess. (1972), reprinted in 1972 U.S.C.C.A.N. 2462,

2511. Athletics featured even more prominently in Congress's

decision to reverse the Grove City rule. See supra pp. 8-9.

Under these circumstances, we find Brown's plaint unbecoming.

B. Affirmative Action.

Brown rehashes its equal protection argument and serves

it up as a nominally different dish, arguing that the district

court's preliminary injunction constitutes "affirmative action"

and violates the Equal Protection Clause because the court lacked

a necessary factual predicate to warrant such a step.18 It is,

however, established beyond peradventure that, where no contrary

legislative directive appears, the federal judiciary possesses

the power to grant any appropriate relief on a cause of action

appropriately brought pursuant to a federal statute.19 See

Franklin, 112 S. Ct. at 1035 (upholding damage remedy for Title

18The "authority" that Brown cites in support of this
proposition, Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 307

(1978) (Powell, J. concurring), in fact suggests the propriety of
affirmative relief where there are judicial findings of a
statutory violation. See id.

19On this point, Brown cannot win even if its basic theories
have merit. If the district court did not engage in the proper
factfinding, then its order constitutes an abuse of its
discretion. If, on the other hand, Title IX does not provide for
equitable relief, the district court will have erred as a matter
of law in choosing a remedy outside the statutory margins. In
either event, given that the statute itself is compatible with
the Equal Protection Clause, Brown cannot prevail on its

constitutional claim.

27

IX violation and noting that prospective relief would be

inadequate); see also Fed. R. Civ. P. 54(c). Hence, this

initiative, too, is bootless.

V. BURDEN OF PROOF

In addition to its constitutional challenges, Brown

questions the district court's allocation of the burden of proof.

It suggests that the analytic model of burden setting and

shifting commonly accepted in Title VII and ADEA cases, see,

e.g., Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248,

254 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-

05 (1973); Mesnick v. General Elec. Co., 950 F.2d 816, 823 (1st

Cir. 1991), cert. denied, 112 S. Ct. 2965 (1992), is ripe for

importation into the precincts patrolled by Title IX. We reject

the suggestion.

In our view, there is no need to search for analogies

where, as in the Title IX milieu, the controlling statutes and

regulations are clear. To invoke the prophylaxis of Title IX,

the statute, 20 U.S.C. 1681(b), and the regulations, read

together, require a Title IX plaintiff to show disparity between

the gender composition of the institution's student body and its

athletic program, thereby proving that there is an

underrepresented gender. Then, the plaintiff must show that a

second element unmet interest is present. In other words,

the plaintiff must prove that the underrepresented gender has not

been "fully and effectively accommodated by the present program."

44 Fed. Reg. at 71,418. If the plaintiff carries the devoir of

28

persuasion on these two elements, she has proven her case unless

the university shows, as an affirmative defense, "a history and

continuing practice of program expansion which is demonstrably

responsive to the developing interests and abilities of the

members" of the underrepresented gender. Id.

Over and beyond the express dictates of the applicable

statute and regulations, there is another valid reason for

eschewing the Title VII paradigm in most Title IX cases. The

scope and purpose of Title IX, which merely conditions government

grants to educational institutions, are substantially different

from those of Title VII, which sets basic employment standards.

See Franklin v. Gwinnett County Pub. Sch., 911 F.2d 617, 622

(11th Cir. 1990) (declining to apply Title VII analysis to Title

IX litigation), aff'd, 112 S. Ct. 1028 (1992). Title IX, while

it applies only to schools that receive federal funds, influences

almost all aspects of educational management. In contrast, Title

VII applies to a much wider range of institutions virtually all

employers but targets only employment-related matters.

Moreover, Title IX is largely aspirational on the whole,

affected institutions choose how to accomplish the statutory goal

whereas Title VII is largely peremptory covered employers

must adhere to statutorily prescribed standards. Thus, the

former is a loosely laced buskin, inhospitable to the specialized

choreography of presumption and production upon which the

Burdine/McDonnell Douglas burden-shifting framework depends.

We conclude, therefore, that excepting perhaps in the

29

employment discrimination context, see Lipsett v. University of

P.R., 864 F.2d 881, 897 (1st Cir. 1988) (applying Title VII

standards in Title IX case, but explicitly limiting the crossover

to the employment context), the Title VII burden-of-proof rules

do not apply in Title IX cases.20 Consequently, a Title IX

plaintiff makes out an athletic discrimination case by proving

numerical disparity, coupled with unmet interest, each by a fair

preponderance of the credible evidence, so long as the defendant

does not rebut the plaintiff's showing by adducing preponderant

history-and-practice evidence.

VI. THE PRELIMINARY INJUNCTION

We come at long last to the cynosure of the appeal.

This is familiar territory. A district court, faced with a

motion for preliminary injunction, must assess the request in

four particular ways, evaluating (1) the movant's probability of

victory on the merits; (2) the potential for irreparable harm if

the injunction is refused; (3) the balance of interests as

between the parties, i.e., whether the harm to the movant if the

injunction is withheld outweighs the harm to the nonmovant if the

injunction is granted; and (4) the public interest. See

Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir.

1991); Aoude v. Mobil Oil Corp., 862 F.2d 890, 892 (1st Cir.

1988); Hypertherm, Inc. v. Precision Prods., Inc., 832 F.2d 697,

20But cf. Cook v. Colgate Univ., 802 F. Supp. 737, 743

(N.D.N.Y. 1992) (applying Title VII process to Title IX case at
urging of parties). Cook is presently on appeal to the Second

Circuit. See supra note 4.

30

699 & n.2 (1st Cir. 1987). Of course, a district court's

conclusions at the preliminary injunction stage are only attempts

to predict probable outcomes. Thus, "a party losing the battle

on likelihood of success may nonetheless win the war at a

succeeding trial . . . ." Guilbert, 934 F.2d at 6.

If, in conducting this tamisage, the district court has

made no clear error of law or fact, we will overturn its

calibration of the four factors only for a manifest abuse of

discretion. See Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir.

1993); Guilbert, 934 F.2d at 5.

Here, the district court found that the quadrat of

factors favored plaintiffs' position. See Cohen, 809 F. Supp. at

985-1001. Brown disagrees with these findings up and down the

line, but offers developed argumentation only as to three of the

four components. Because Brown does not explain its challenge to

the district court's finding that the public interest would be

disserved by leaving the two women's teams on the sidelines until

the suit is finally resolved, we ignore its pro forma protest in

that respect. Litigants cannot preserve an issue for appeal

simply by raising a pennant and then moving on to another

subject. See United States v. Slade, 980 F.2d 27, 30-31 & n.3

(1st Cir. 1992) (reiterating that theories not briefed or argued

on appeal are waived); Ryan v. Royal Ins. Co., 916 F.2d 731, 734

(1st Cir. 1990) (stating that "issues adverted to on appeal in a

perfunctory manner, unaccompanied by some developed

argumentation, are deemed to have been abandoned"). Accordingly,

31

we limit our review to the three factors briefed and argued.

A. Likelihood of Success.

It is old hat, but still very much in fashion, that a

movant's likelihood of success at trial is particularly

influential in the preliminary injunction calculus. See Weaver,

984 F.2d at 12; Guilbert, 934 F.2d at 6; Public Serv. Co. v. Town

of West Newbury, 835 F.2d 380, 383 (1st Cir. 1987). In this

case, the district court paid meticulous attention to the

parties' prospects for success over the long haul. The court

plainly visualized both the factual intricacies and legal

complexities that characterize Title IX litigation. It held a

lengthy adversary hearing and reviewed voluminous written

submissions. And at journey's end, it correctly focused on the

three-part accommodation test.

The court faultlessly dispatched the first two elements

of the test. With respect to the comparison between Brown's

athletic agenda and student body, we adopt the lower court's

record-rooted finding that the University did not meet or even

closely approach the "substantial proportionality" threshold

because it offered too few varsity opportunities for women. See

Cohen, 809 F. Supp. at 991. Cognizant, perhaps, that the raw

numbers tell an unambiguous tale, Brown does not challenge the

inviolability of this finding.

As to the test's second part, the court below found

that, although Brown could point to "impressive growth" in its

women's athletic program in the 1970s, the school had not

32

continued filling the gap during the next two decades. Id. On

this basis, the court concluded that Brown had not met the

benchmark. See id. Brown asserts that the district court erred

by not crediting it sufficiently for its dramatic expansion of

women's sports in the 1970s, and we are not entirely

unsympathetic to this plea. In the last analysis, however, this

was a judgment call and the trial court's judgment was not

unreasonable. While a university deserves appreciable applause

for supercharging a low-voltage athletic program in one burst

rather than powering it up over a longer period, such an

energization, once undertaken, does not forever hold the

institution harmless. Here, Brown labored for six years to weave

a broad array of new activities into the fabric of its palestrian

offerings. The district court apparently believed, however, that

Brown then rested on its laurels for at least twice that long.

The very length of this hiatus suggests something far short of a

continuing practice of program expansion. And, moreover, a

university must design expansion in whatever form and at whatever

pace to respond to the flux and reflux of unserved interests.

The court below found that Brown failed in this task. See id.

The issue of responsiveness is fact-intensive and in most

instances, as here, its resolution will be within the trier's

province. We find no error, therefore, in the district court's

resolution of the second aspect of the accommodation test.

The third benchmark presents a more problematic

scenario. The district court incorrectly held that Brown bore

33

the burden of showing that it had fully and effectively

accommodated the interests and abilities of its women athletes.

See id. at 997. Section 1681(b) requires that the plaintiffs,

rather than the University, prove a shortfall in the full and

effective accommodation of interested female athletes by showing,

initially, both numerical disparity and unmet interest. See

supra Part V. Nonetheless, we do not think that the court's

bevue is fatal. Even when a trial court has misconstrued the

law, an appellate tribunal may avoid remanding if the record is

sufficiently developed and the facts necessary to shape the

proper legal matrix are sufficiently clear. See, e.g., Societe

Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633,

642 (1st Cir. 1992) (coupling district court's factual findings

with correct rule of law); United States v. Mora, 821 F.2d 860,

869 (1st Cir. 1987) (same); see also Cameron v. Tomes, F.2d

, (1st Cir. 1993) [No. 92-1343, slip op. at 14-15] (using

findings of fact made in the framework of an unacceptable legal

analysis to affirm injunctive relief on a different legal

theory).

We find this to be a particularly auspicious setting in

which to employ such a device. Although the full and effective

accommodation of athletic interests is likely to be a complicated

issue where allegedly underrepresented plaintiffs sue to force a

university to create a neoteric team or upgrade the status of a

club team, see, e.g., Cook, 802 F. Supp. at 737, there is

unlikely to be any comparably turbid question as to interest and

34

ability where, as here, plaintiffs are seeking merely to

forestall the interment of healthy varsity teams.

In this instance, the district court's subsidiary

findings of fact render it beyond cavil that the plaintiffs

carried their burden of proof. The court found, for example,

that there was "great interest and talent" amongst Brown's female

undergraduates which, following the cuts, would go unserved.

Cohen, 809 F. Supp. at 992. Of particular moment, the court also

found the interest and talent on campus ample to support women's

varsity volleyball and gymnastics teams, see id. a finding that

is hardly surprising in view of the teams' robust health before

the budget-cutters arrived on the scene. The court proceeded to

note that, while club teams can be equivalent to intercollegiate

teams when they regularly participate in varsity competition, see

44 Fed. Reg. at 71,413 n.1, the teams that Brown downgraded would

not regularly be competing against varsity teams and would suffer

a diminution of status in a wide range of other significant

respects. See Cohen, 809 F. Supp. at 992-93.

The potency of this evidence is an effective antidote

to the district court's partial misapplication of the burden of

proof. Because the record contains nothing that would allow a

trier to find that Brown's athletic agenda reflects the makeup of

its student body or that the plaintiff class is so poorly

populated as to warrant a reduction in women's sports,21 the

21It bears mentioning in this regard that Judge Pettine
heard, and apparently credited, evidence indicating that there
were other women's club teams sufficiently accomplished and

35

court's error was harmless. In a nutshell, the plaintiffs met

their challenge on parts one and three of the accommodation test.

This conclusion, in partnership with the district court's

supportable finding that Brown did not satisfactorily demonstrate

a continuing expansion of its women's athletic lineup, strikes

the gold. The court's prediction of plaintiffs' probable success

was, therefore, adequately grounded.

B. Irreparable Injury.

The next area of inquiry is irreparable harm. The

district court heard from a variety of athletic administration

experts. The court concluded that, absent judicial intervention,

the plaintiffs would suffer irremediable injury in at least three

respects: competitive posture, recruitment, and loss of

coaching. As club teams, the district court thought women's

volleyball and gymnastics would increasingly become less

competitive, have fewer players, be unable to schedule varsity

teams from other schools, become unattractive to potential stars

making college choices, and suffer stagnation in the growth of

individual talent due to the absence of coaching.22 See Cohen,

809 F. Supp. at 992-93. Certainly, these harms exist to some

degree. In highly nuanced cases involving a melange of competing

populated to flourish as varsity squads. Cohen, 809 F. Supp. at

992.

22Brown does not retain coaches for its club teams and few
of the teams have the independent financial wherewithal to hire
coaches. Here, the district court specifically found that if the
gymnastics team was downgraded to club status, it would likely
lose its paid coach when her contract expired in June of 1993.
Cohen, 809 F. Supp. at 992.

36

considerations, the aggregate injury, and whether or not it is

irreparable, come primarily within the trial court's ken. See K-

Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir.

1989) (acknowledging that "[d]istrict courts have broad

discretion to evaluate the irreparability of alleged harm")

(citation omitted). So it is here. Although the types of harms

the court catalogued might not all rise to the same level of

seriousness, the overall record supports, even though it does not

compel, the court's assessment of their cumulative severity.

Given, especially, the lack of any other concinnous remedy

pendente lite, we will not second-guess the district court's

finding of irreparable injury.

C. The Balance of Harms.

Finally, the district court found that the competing

equities weighed in favor of granting the injunction. After

hearing testimony from Brown's Financial Vice-President and its

Associate Athletic Director, the district court concluded that

the cost of the interim injunction would be relatively slight;

and that, in view of discretionary funds already contained in the

Athletic Department budget and a presidential "contingency fund,"

Brown possessed the wherewithal to defray the costs without undue

hardship. See Cohen, 809 F. Supp. at 1000-01. By contrast, the

court noted the volleyball and gymnastics programs' continuing

deterioration in the aftermath of the demotion. See id. at 992-

93. On balance, the court determined that the financial burden

on Brown was tolerable, and, in any event, was overbalanced by

37

the potential harm to the plaintiff class if the court took no

action.

Brown contests the results of this balancing on the

premise that the district court wrongly discounted the testimony

of one of its witnesses and did not adequately consider the

possibility that false hopes might be raised by a preliminary

injunction. It is, however, axiomatic that a district court,

sitting without a jury, may selectively discount testimony as it

weighs conflicting viewpoints and adjudicates the facts. See

Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 500

(1984); Anthony v. Sundlun, 952 F.2d 603, 606 (1st Cir. 1991).

This is a trial court's prerogative and, indeed, its duty.

It is similarly fundamental that a preliminary

injunction, by its very nature, is sometimes ephemeral. Hence,

the risk that some observers might read into a temporary

restrainer more than it eventually proves to mean is endemic to

the equitable device and cannot tip the scales against its use in

any particular circumstance. It defies elemental logic to say

that parties who the court has determined will probably succeed

at trial should be denied the interim relief to which they are

entitled because their ultimate victory is less than absolutely

certain.

In fine, the district court did not overspill its

discretion either in taking Brown's self-interested description

of its financial plight with a grain of salt or in limiting the

role that raising false hopes might play in the equitable

38

calculus.

D. Summing Up.

We summarize succinctly, beginning with the probability

of plaintiffs' success. In an era where the practices of higher

education must adjust to stunted revenues, careening costs, and

changing demographics, colleges might well be obliged to curb

spending on programs, like athletics, that do not lie at the

epicenter of their institutional mission. Title IX does not

purport to override financial necessity. Yet, the pruning of

athletic budgets cannot take place solely in comptrollers'

offices, isolated from the legislative and regulatory imperatives

that Title IX imposes.

This case aptly illustrates the point. Brown earnestly

professes that it has done no more than slash women's and men's

athletics by approximately the same degree, and, indeed, the raw

numbers lend partial credence to that characterization.23 But,

Brown's claim overlooks the shortcomings that plagued its program

before it took blade in hand. If a school, like Brown, eschews

the first two benchmarks of the accommodation test, electing to

stray from substantial proportionality and failing to march

uninterruptedly in the direction of equal athletic opportunity,

it must comply with the third benchmark. To do so, the school

23We note, however, that while the cuts proposed by Brown
eliminate a roughly equal number of athletic opportunities for
women as for men, those cuts subtract roughly four times more
money from the budget for female pancratiasts than from the
budget for their male counterparts. See supra pp. 4-5. And, as

a noted playwright once observed, "where there is no money, there
is no change of any kind." Moss Hart, Act One (1959).

39

must fully and effectively accommodate the underrepresented

gender's interests and abilities, even if that requires it to

give the underrepresented gender (in this case, women) what

amounts to a larger slice of a shrinking athletic-opportunity

pie.

The record reveals that the court below paid heed to

these realities. It properly recognized that even balanced use

of the budget-paring knife runs afoul of Title IX where, as here,

the fruits of a university's athletic program remain ill-

distributed after the trimming takes place. Because the district

court understood this principle, and because its findings of fact

as to the case's probable outcome are based on substantial

evidence, the court's determination that plaintiffs are likely to

succeed on the merits is inexpugnable.

The district court displayed similar dexterity in

touching the other three bases en route to a grant of injunctive

relief: irreparability of injury, the relative weight of

potential harms, and impact on the public interest. The court

found that the harm to the plaintiff class was irremediable,

absent prompt injunctive relief; that the balance of harms

favored such relief; and that the overriding public interest lay

in the firm enforcement of Title IX. In each of these areas, as

in the likelihood-of-success arena, the court made serial

findings that, taken at face value, amply justify injunctive

relief. Because these findings derive adequate support from the

record, the court's decree must stand as long as the specific

40

relief the court ordered was appropriate. It is to this issue

that we now turn.

VII. REMEDIATION

After applying the preliminary injunction standard, the

district court ordered relief pendente lite, temporarily

reinstating the women's volleyball and gymnastics teams. Brown

argues that such specific relief is inappropriate because it

intrudes on Brown's discretion. The point has some cogency. We

are a society that cherishes academic freedom and recognizes that

universities deserve great leeway in their operations. See,

e.g., Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 795 (1st

Cir. 1992), petition for cert. filed (Feb. 3, 1993); Lamphere v.

Brown Univ., 875 F.2d 916, 922 (1st Cir. 1989). In addition,

Title IX does not require institutions to fund any particular

number or type of athletic opportunities only that they provide

those opportunities in a nondiscriminatory fashion if they wish

to receive federal funds.

Nonetheless, the district court has broad discretionary

power to take provisional steps restoring the status quo pending

the conclusion of a trial. See Ricci v. Okin, 978 F.2d 764, 767

(1st Cir. 1992); Guilbert, 934 F.2d at 7 & n.3. Considering the

district court's proper estimation and deft application of the

preliminary injunction standard, see supra Part VI, we think that

requiring Brown to maintain the women's volleyball and gymnastics

teams in varsity status for the time being is a remedial choice

within the district court's discretion. That is not to say,

41

however, that the same remedy will be suitable at trial's end if

the Title IX charges prove out against Brown. The district court

has noted, we believe appropriately, that if it ultimately finds

Brown's athletic program to violate Title IX, it will initially

require the University to propose a compliance plan rather than

mandate the creation or deletion of particular athletic teams.

Cohen, 809 F. Supp. at 1001. Although the district court has the

power to order specific relief if the institution wishes to

continue receiving federal funds, see Franklin, 112 S. Ct. at

1035, the many routes to Title IX compliance make specific relief

most useful in situations where the institution, after a judicial

determination of noncompliance, demonstrates an unwillingness or

inability to exercise its discretion in a way that brings it into

compliance with Title IX.

VIII. CONCLUSION

We need go no further. This litigation presents an

array of complicated and important issues at a crossroads of the

law that few courts have explored. The beacon by which we must

steer is Congress's unmistakably clear mandate that educational

institutions not use federal monies to perpetuate gender-based

discrimination. At the same time, we must remain sensitive to

the fact that suits of this genre implicate the discretion of

universities to pursue their missions free from governmental

interference and, in the bargain, to deploy increasingly scarce

resources in the most advantageous way. These considerations,

each of which is in service to desirable ends, are necessarily in

42

tension in Title IX cases. Thus, there are unlikely to be ideal

solutions to all the vexing problems that might potentially

arise.

This appeal exemplifies many of the difficulties

inherent in Title IX litigation. We do not presume to say that

the district court's interim solution is perfect, but it is fair

and it is lawful. On the record compiled to date, the

preliminary injunction requiring Brown to reinstate its women's

volleyball and gymnastics teams for the time being came well

within the encincture of judicial discretion. We will not

meddle.

The preliminary injunction is affirmed, the temporary

stay is dissolved, and the cause is remanded to the district

court for further proceedings. Costs to appellees.

43